HENRY DVORKIN AND ESTHER DVORKIN, PLAINTIFFS-APPELLANTS, v. TOWNSHIP OF DOVER, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued February 3, 1959—Decided March 10, 1959.

*Mr. Algernon T. Sweeney* argued the cause for the plaintiffs-appellants (*Mr. Victor Samuel,* attorney).

*Mr. Roy G. Simmons* argued the cause for the defendant-respondent (*Messrs. Camp and Simmons,* attorneys).

The opinion of the court was delivered by

BURLING, J. This is an action for a refund of moneys paid by plaintiffs Henry Dvorkin and Esther Dvorkin, his wife, to defendant Township of Dover, County of Ocean, for an assignment of a tax sale certificate on lands subsequently redeemed by a party in interest. The facts were stipulated and the Superior Court, Chancery Division, entered a judgment in favor of the defendant. Plaintiffs prosecuted an appeal to the Superior Court, Appellate Division, and while the cause was pending there this court certified it on our own motion.

On May 22, 1956 defendant, pursuant to the provisions of *N. J. S. A.* 54:5–114.2 *et seq.* (*L.* 1943, *c.* 149, *p.* 425, § 1), and after duly advertising and posting notice, held a public sale of a tax sale certificate covering lands in the township. The notice set forth the date and time of sale; that the sale was being held pursuant to a resolution of the township committee; that the subject matter of the sale was a "Certificate of Tax Sale No. 1209 covering Lot 25, Block 192, as shown on Tax Map of said Township, the owner of which land is Jonathan Johnson's heirs, as shown in Collector's list"; that no bid of less than $564.68 would be accepted, said sum representing the full amount due the township upon the certificate with all interest and costs and subsequent taxes to the end of the year 1956, and that the governing body would consider confirmation of the sale at its next regular meeting after the sale.

At the sale the township attorney publicly announced that the township made no representations as to the area or acreage of lot 25 and that the township was selling its interest in the lands covered by the tax sale certificate "as is"; that the purchaser would not get a deed from the township but would only get an assignment of the tax sale certificate. It was further announced: "that no claim for any refund of any part of the purchase price for any reason whatsoever need be recognized by the Township." Opportunity was afforded prospective bidders to examine the township tax map and to ask questions of the township attorney. No one availed himself of these opportunities.

Thereupon, 37 separate bids were made for the certificate by four interested bidders—the certificate being struck off to plaintiffs as high bidder for the sum of $2,810, plus $43.15 incidental expenses. On June 12, 1956 the township committee adopted a resolution confirming the sale and authorized the execution and delivery of the assignment of the tax sale certificate. Plaintiffs then recorded it in the Ocean County Clerk's office.

On January 24, 1957 James W. Clayton, a person having an interest in the land, redeemed the property by the pay-

ment to the tax collector of the township of the sum of $593.35, this amount representing the amount due on the certificate with interest to the date of redemption. A certificate of redemption was then executed by the tax collector.

Plaintiffs, after making demand for the $2,810 paid by them for the assignment of the tax sale certificate, commenced the instant action for refund. The Superior Court, Chancery Division, held that plaintiffs are limited to recovering the amount paid by the redeemer and may not recover the full amount bid by them at the public sale. 49 *N. J. Super.* 335.

The question at issue is one of first impression in this State: May an assignee of a tax sale certificate purchased at public sale pursuant to *N. J. S. A.* 54:5–114.2 (*a*) recover from the municipality the excess of the price bid for the assignment over the amount required for redemption, in the event that the property is subsequently lawfully redeemed by the owner or the person having an interest in the property?

*N. J. S. A.* 54:5–114.2 provides in pertinent part:

"The governing body of any municipality may sell any certificate of tax sale including all subsequent municipal liens held by such municipality by one of the following methods:

(a) At public sale to the highest bidder. * * *; or

(b) The governing body may from time to time determine by resolution the certificates of tax sale including all subsequent liens held by such municipality which such municipality deems advisable to sell for an amount lower than the total amount due, together with interest and costs on the certificate of sale. * * * Upon the receipt of any bid which the governing body may be inclined to accept, the governing body shall give public notice setting forth the amount of the bid for the certificate of tax sale including subsequent municipal liens together with interest and costs, the description of the several lots and parcels of land covered by such certificate of sale and subsequent municipal liens, the name of the owner of the land as contained in the collector's list and also the total amount which would otherwise be required for redemption to the date of proposed sale and stating in substance that the governing body will accept or reject such bid at a regular meeting of the governing body and setting forth the place, time and date of such regular meeting. * * *"

The parties to this appeal lay stress upon *N. J. S. A.* 54:5–114.8 which states:

"When in any action, brought to bar the right of redemption, under a certificate or certificates sold pursuant to the provisions hereof, any defendant to said action or any other person in interest shall redeem said property by paying the full amount found to be due by the court, the assignee shall only be entitled to receive out of said moneys the amount actually paid to the municipality for said assignment together with lawful interest thereon from the date of payment and the taxed costs of said action, the balance shall be paid to the municipality." (*L.* 1943, *c.* 149, *p.* 429, § 7.)

Plaintiffs contend that the words "out of said moneys" ought to be excised from the statute through the process of interpretation—thus providing express statutory authorization for the refund in question. Defendant, on the other hand, asserts that the statute means what it says and that the term "out of said moneys" logically compels the conclusion that an assignee of the tax sale certificate may only recoup, upon redemption, the moneys paid by the redeemer.

In our view *N. J. S. A.* 54:5–114.8 is totally inapplicable to the problem at hand and enlightenment must be found from other sources. This conclusion can most readily be demonstrated by an examination into the history and basic purposes of the various methods by which a municipality may assign tax sale certificates held by it.

 There are four basic statutory provisions authorizing the sale or assignment of municipally held tax sale certificates. All of these provisions are designed to convert tax sale certificates into usable cash without the necessity of the municipality first proceeding to bar or foreclose the right of redemption under *R. S.* 54:5–77 *et seq.; N. J. S. A.* 54:5–85 *et seq.* or *N. J. S. A.* 54:5–104.29 *et seq.*

*R. S.* 54:5–112 (*L.* 1922, *c.* 227, § 1) provides that "When a municipality has or shall have acquired title to real estate by reason of its having been struck off and sold to the municipality at a sale for delinquent taxes or assessments, the governing body thereof may, by resolution * * *, sell such real estate at private sale to such person

and for such sums, not less than the amount of municipal liens charged against the same, as shall seem to be to the best interest of the municipality. * * *"

Although not necessary to a disposition of this cause, it might be observed that *R. S.* 54:5–112, in effect, relates to assignments of tax sale certificates, rather than the sale of municipally-owned real estate such as under *R. S.* 40:60–26, as amended. This is made evident by the last sentence which provides, "Such sales shall not include real estate, title to which has been perfected by the municipality." While the statute provides that the municipality shall execute and deliver a deed without covenants to the purchaser, it seems clear that the purchaser obtains, in effect, an assignment of the tax liens subject to the equity of redemption. *R. S.* 54:5–112 has never been construed by the courts, and in light of *R. S.* 54:5–113, referred to hereafter, may presently be superfluous. We have engaged in this parenthetical digression from the main stream of thought to highlight the fact that our examination of the various methods for disposing of tax sale certificates has revealed that they have been the result of piecemeal efforts to deal with specific problems as they arose. Areas of overlap and possible problems resulting from provisions unclear in import could, it is suggested, be greatly minimized by comprehensive revision of the legislation in this field. Refer to Governor Edge's veto message of *Senate Bill No.* 177 (May 1, 1945).

Apparently *R. S.* 54:5–112 was not sufficiently flexible to meet the diverse needs of municipalities holding tax sale certificates and desiring to assign them for ready cash, especially in those instances where the amount of the liens chargeable against the land exceeded its assessed value. Therefore, *R. S.* 54:5–113 (*L.* 1927, *c.* 235, § 1, as amended by *L.* 1928, *c.* 124, § 1) provides in part that the municipality may:

"authorize a private sale of the certificate of tax sale therefor, together with subsequent liens thereon, for not less than the amount of liens charged against such real estate. The sale shall be made by assignment executed by such officers as may be designated in the

resolution. When the total amount of the municipal liens shall, at the time of the proposed sale or assignment, exceed the assessed value of the real estate as of the date of the last sale thereof for unpaid taxes and assessments, the certificates, together with subsequent liens thereon, may be sold and assigned for a sum not less than such assessed value."

But again the legislative objective of enabling local governments to realize taxes without first expending money to foreclose or bar the equity of redemption was frustrated in certain instances, *i. e.*, where the amount of the liens and the assessed value of the property both exceeded the fair market value of the property. To remedy this situation the Legislature in 1941 enacted *N. J. S. A.* 54:5–114.1 (*L.* 1941, *c.* 232, § 1). *N. J. S. A.* 54:5–114.1 is exactly the same as *N. J. S. A.* 54:5–114.2 except that under *N. J. S. A.* 54:5–114.1 the sale does not include municipal liens accruing since the date of the issuance of the tax sale certificate. The purpose of *N. J. S. A.* 54:5–114.1 is made clear by the introducer's statement which reads:

"This bill provides two additional methods for disposing of tax sale certificates when held by a municipality. When the assessment on the land covered by the certificate and the amount necessary to redeem the certificate both exceed the value of the land, so far as the purchaser is concerned, the municipality is unable to dispose of the certificate under our present law. The two methods provided by this bill will give further opportunity for disposal of such tax sale certificates held by municipalities in such case."

In 1943, *N. J. S. A.* 54:5–114.2 *et seq.* was passed. This act not only authorized the assignment of tax sale certificates, including all subsequent liens, either at public sale to the highest bidder or at a private sale for an amount less than the amount of the liens, including all subsequent liens, but had as its objective an added feature, namely, the return of the property to the paying tax rolls. This was accomplished by providing for the mandatory foreclosure at the purchaser's expense of the equity of redemption within two years from the date of confirmation of the assignment at the risk of forfeiting the purchase money. *N. J. S. A.* 54:5–114.4,

N. J. S. A. 54:5–114.6. The introducer's statement to N. J. S. A. 54:5–114.2 *et seq.* is to the following effect:

"Sound financial policy requires the liquidation of tax title lien delinquency and a return of the tax lien property to the ratable list. Many municipalities are without sufficient funds to liquidate their outstanding liens. The act provides not only for an easy disposition of tax sale certificates and subsequent liens, but also for an independent foreclosure by the purchaser at his own expense."

It has been held that the nature of the right acquired by the purchaser of the tax sale certificate varies with the section under which the sale was had. The purchaser of a tax sale certificate under *N. J. S. A.* 54:5–114.2 acquires a far more qualified right than one who purchases at private sale for the full amount of the accrued liens or the assessed value of the property under *R. S.* 54:5–113. Thus, where a sale was had under *R. S.* 54:5–113 for an amount less than the amount required to redeem, it has been held that the assignee of the tax sale certificate, having acquired the full rights of the municipality in the land by virtue of the assignment, is entitled to the excess when the owner or a party in interest redeems. *Parlo v. Van Horn,* 27 *N. J. Super.* 64 (*Ch. Div.* 1953); *Kerr v. Trescher,* 34 *N. J. Super.* 437 (*Ch. Div.* 1955). And it has been held that the municipality, until the final foreclosure decree, is entitled to the rents and profits and is "deemed to hold the property as security for the full payment by the property owner to it, of its taxes due." *Fidelity Union Trust Co. v. City of Newark,* 11 *N. J. Super.* 205, 209 (*Cty. Ct.* 1950). See *N. J. S. A.* 54:5–53.1 as amended. It should again be emphasized that under *N. J. S. A.* 54:5–114.2 *et seq.* the purchaser is required to redeem within two years under penalty of forfeiture.

Viewed against the background of the full complement of the statutory alternatives for the assignment of municipally held tax sale certificates, the purposes prompting their enactment, and the differing legal incidents of each, the legislative purpose in enacting *N. J. S. A.* 54:5–114.8 becomes clear. It was to prevent the assignee of a tax

sale certificate under *N. J. S. A.* 54:5-114.2 from reaping a profit in the event of redemption where the assignment was for *less* than the amount of the liens covered by the tax sale certificate, together with subsequent liens, interest and costs (the amount required to redeem). We have previously noted that *R. S.* 54:5-113 contemplates such a profit and, in the absence of an express statutory provision contained in *N. J. S. A.* 54:5-114.8, the same result might have been reached under *N. J. S. A.* 54:5-114.2. In short, the intendment and effect of the act is to authorize the municipality to discount its accounts receivable in order to return the property to the paying tax rolls within a relatively short period of time, subject to a complete rescission of the transaction in the event that the owner of the property or one having an interest therein decides to redeem.

Thus viewed, it is clear that *N. J. S. A.* 54:5-114.8 does not purport to deal with the situation here where the purchaser pays *more* than the amount required to redeem. The instant case involves a situation which apparently escaped the attention of the draftsman of *N. J. S. A.* 54:5-114.2 *et seq.,* or at least was one where it was felt that the solution did not require an express statutory provision. The judicial task becomes one of resolving, within the framework of the appropriate canons of construction, the probable legislative intention, bearing in mind the admonition of Chief Justice Weintraub in *New Capitol Bar & Grill Corp. v. Div. of Employment Sec.,* 25 *N. J.* 155, 160 (1957) that:

"It is frequently difficult for a draftsman of legislation to anticipate all situations and to measure his words against them. Hence cases inevitably arise in which a literal application of the language used would lead to results incompatible with the legislative design. It is the proper function, indeed the obligation, of the judiciary to give effect to the obvious purpose of the Legislature, and to that end 'words used may be expanded or limited according to the manifest reason and obvious purpose of the law. The spirit of the legislative direction prevails over the literal sense of the terms.' *Alexander v. New Jersey Power & Light Co.,* 21 *N. J.* 373, 378 (1956) ; *Wright v. Vogt,* 7 *N. J.* 1, 6 (1951) ; *Glick v. Trustees of Free Public Library,* 2 *N. J.* 579, 584 (1949)."

In our view there are a number of reasons why the result urged by the defendant township should not prevail. Where, as here, the bid exceeds the sum required for redemption, then the rudiments of fairness and good faith dealing require that the bidder be made whole in the event of redemption. A contrary conclusion results in a forfeiture—an assumption not lightly to be indulged, especially where we are called upon to determine the respective rights arising from the dealings of the citizen and his government. Particularly apt in this connection, although expressed in another interpretive context, are the thoughts of the court in *United States v. Lennox Metal Manufacturing Co.*, 225 *F. 2d* 302, 309 (*2 Cir.* 1955):

"At the trial, government counsel conceded that, under the interpretation for which the government then contended, the clause would give the government, upon termination of the contract, title to thousands of dollars of property even if the government had made a partial payment of but $50. If this interpretation were correct, then the clause 'set a skillful trap' for the 'unwary' defendant, and 'No such purpose should be attributed to the government. * * * In construing the document the presumption should be indulged that both parties were acting in good faith.' *Sylvan Crest Sand & Gravel Co. v. United States*, 2 *Cir.*, 150 *F. 2d* 642, 643. It 'is not out of place to say that the government should be animated by a justice as anxious to consider the rights of the bidder as to insist upon its own.' *United States v. Purcell Envelope Co.*, 249 *U. S.* 313, 318, 39 *S. Ct.* 300, 301, 63 *L. Ed.* 620."

It might be parenthetically observed that the inequity of the result argued by the defendant is compounded by the fact that, as we have previously noted, the assignee of the tax sale certificate is prohibited from making a profit.

Defendant contends that the bidders at the sale were knowingly taking a calculated risk in bidding more for the certificate than would be required to redeem, on the chance that there would be no redemption and title might be perfected. Thus, we are told, in effect, that the public sale of the tax sale certificate is a lottery (a result difficult to avoid where, as here, it is advertised that the bidding must *start* at the amount required to redeem). That the

Legislature did not intend a gaming event is an assumption we feel may be freely and safely relied upon.

A return to the first principles of statutory interpretation teaches that when the lawgiver's intent is in doubt, the court "ought to interpret the law to be what is most consonant to equity and least inconvenient." *Kerlin's Lessee v. Bull*, 1 *Dall.* 175, 1 *U. S.* 175, 1 *L. Ed.* 88 (*Sup. Ct. Pa.* 1786); *Associates of Jersey Company v. Davison*, 29 *N. J. L.* 415, 424 (*E. & A.* 1860). This is the doctrine of "equity of the statute" which found expression in *Eyston v. Studd*, 2 *Plowd.* 459A, 75 *Eng. Rep.* (1574), and from which flows the constructional aid that has taken firm roots in our jurisprudence—that the spirit of the legislative direction prevails over its terms. See *Horack, Sutherland Statutory Construction* (3d ed. 1943), §§ 6001 to 6007; *McCaffrey, Statutory Construction*, § 4, *p.* 8 (1953).

We might add that the "equity of the statute" rule does not, when properly applied, substitute the judicial for the legislative will, but rather in the consideration of all the material elements reaches the result probably intended by the draftsman had he anticipated the situation at hand. Indeed, to hold otherwise in the absence of considerations clearly requiring such a contrary construction, is to claim for the judiciary a monopoly on the ability to perceive the justice of a cause.

It might be argued that the possibility of a profit for the municipality was paramount in the Legislature's mind and therefore, despite the considerations previously alluded to, the result urged by the defendant is correct. As we have previously noted, at the time of the enactment of *N. J. S. A.* 54:5–114.2 *et seq.*, the basic objective of the Legislature was to afford municipalities, who could not sell tax sale certificates held by them because the amount of the liens and assessed value exceeded the fair market value of the land, an opportunity to convert such certificates into usable cash (albeit at a discount) without the necessity of first foreclosing and to have the property come into the hands of one able to pay the future liens. It is a question of

serious doubt whether the Legislature even thought of the possibility of a profit in the assignment of the tax sale certificate. That fact would not, in the absence of an express statutory provision, preclude the possibility of a yield to the municipality. Assuming for purposes of argument that the intention of the Legislature was to provide the greatest possible yield to the municipality, it might be inquired, how may that result be reached? Surely not by construing the statute to provide for a forfeiture upon redemption, for in that event bidding would be stifled. The prospective bidder would not, in most instances, bid .much beyond the amount of the liens owing, even though that amount is far less than the fair market value of the property. It may be that in an isolated instance the unwary or reckless bidder will bid a price substantially in excess of the amount required to redeem and the municipality will gain a windfall. But such instances would only lend emphasis to the long range effect of restraining competitive bidding—and the municipalities of the State will lose far more where assignee of the tax sale certificate (having purchased for less than the fair market value) does foreclose the equity of redemption.

 There are other legislative provisions which buttress the view that the legislative intent was that the excess over the amount required to redeem be returned to the assignee of the tax sale certificate. It has been held that the statutes forming a portion of a comprehensive plan for assessment, levying and collection of realty taxes are *in pari materia* and must be read together. *Nordell v. Mantua Tp.*, 45 *N. J. Super.* 253 (*Ch. Div.* 1957); *Kerr v. Trescher, supra.* An analogous situation to the instant one in the statutory scheme is provided in *R. S.* 54:5–32, dealing with the original sale of tax sale certificates. That section provides:

"The sale shall be made in fee to such person as will purchase the property, subject to redemption at the lowest rate of interest, but in .no case in excess of eight per cent *per annum.* If at the sale a person shall offer to purchase subject to redemption at a rate of interest less than one per cent, he may, in lieu of any rate of interest to redeem, offer a premium over and above the amount of taxes, assessments or other charges, as in this chapter specified,

due the municipality, and the property shall be struck off and sold to the bidder who offers to pay the amount of such taxes, assessments or charges, plus the highest amount of premium."

Thus, when the bidding falls below one per cent interest, the bidder may bid a premium. *R. S.* 54:5–33, as amended, then specifically provides in part:

"* * * Any premium payment shall be held by the collector and returned to the purchaser of the fee if and when redemption is made. If redemption is not made within five years from date of sale the premium payment shall be turned over to the treasurer of the municipality and become a part of the funds of the municipality."

It is difficult to discern why the Legislature would intend that a purchaser of the initial tax sale certificate should recoup his premium, and yet, that an assignee of a tax sale certificate held by the municipality (because no one would bid for it in the first instance, *R. S.* 54:5–34) should forfeit the premium. This difficulty is heightened by the fact that the assignee of the municipally held tax sale certificate under *N. J. S. A.* 54:5–114.2 receives a more qualified and less valuable right than the original purchaser, for instance, the fact that in the former instance foreclosure must be within two years, while in the latter the purchaser has five years within which to foreclose, in order to avoid forfeiture.

That the Legislature intended the result urged by the plaintiffs is further strengthened by the enactment in 1950 of *N. J. S. A.* 54:5–114.9 (*L.* 1950, *c.* 45, § 1) a supplement to *N. J. S. A.* 54:5–114.2 *et seq.* That section provides that an assignee of a tax sale certificate under *N. J. S. A.* 54:5–114.2 *et seq.,* who has obtained a legal title by voluntary conveyance from the owner and who at the public sale of the tax certificate shall have paid a sum not less than the full amount due on the certificate, together with all interest, costs and subsequent taxes, may apply to the municipality for a cancellation of the tax sale certificate; "provided, such application is made within five years from the date of said public sale and the municipality, prior to such

application, shall not have resold such tax sale certificate; and provided further, *that in no case shall the municipality refund any of the moneys paid to it for such tax sale certificate at public sale thereof under this act."* (Emphasis supplied.)

If, as defendant contends, *N. J. S. A.* 54:5-114.2 *et seq.* contemplates that the assignee is not entitled to recoup the excess of the amount bid over the amount required to redeem, then the second proviso in *N. J. S. A.* 54:5-114.9 would have been unnecessary. That proviso seems to presuppose that in the event of redemption the assignee would be entitled to a refund.

The provision for forfeiture of the right to a refund in the event that the assignee acquires the title by a private deal with the owner readily squares with the thesis that such a forfeiture should not be permitted in the event of redemption. Where the assignee bids more than the amount required to redeem, but subsequently successfully forecloses the equity of redemption, the municipality is entitled to the purchase price. The evident purpose of *N. J. S. A.* 54:5-114.9 is to prevent the assignee from privately dealing with the owner in order to save the expense of foreclosing and in addition obtaining a refund of the excess over the amount required to redeem, since, had the assignee been forced to foreclose, such refund would not have been available. Thus, the proviso was necessary in order to prevent the municipality from being defrauded under the specific circumstances dealt with in *N. J. S. A.* 54:5-114.9, and the fact that it was felt essential to expressly provide that the assignee was not entitled to a refund lends credence to the conclusion that such a refund was contemplated where, as here, the property is redeemed.

For all of the reasons advanced we hold that the Legislature intended that the assignee of tax sale certificates under *N. J. S. A.* 54:5-114.2 *et seq.* may recover from the municipality the full amount bid for the assignment (in this case the sum of $2,810) in the event the property is subsequently redeemed.

At the sale the township attorney announced: "that no claim for any refund of any part of the purchase price for any reason whatsoever need be recognized by the Township." Plaintiffs candidly admit the good faith of the defendant in laying down the condition. We by-pass any comment on the possibility that the fair implication of the word "need" in the condition renders it arbitrary and illusory, preferring rather to rest our decision on what seems to us more elemental grounds.

Irrespective of the good faith of the defendant in imposing the condition of sale, that condition is in conflict with the implied provision of the statute that the purchaser is entitled to a refund.

It is a settled proposition that "That which is clearly implied from the purpose which underlies a statute is as much a part of the law as that which is expressed. *Brandon v. Board of Commissioners of Town of Montclair,* 124 *N. J. L.* 135, 143 (*Sup. Ct.* 1940), affirmed 125 *N. J. L.* 367 (*E. & A.* 1940).", *Ranney v. Istituto Pontificio Delle Maestre Filippini,* 20 *N. J.* 189, 197–198 (1955), and *a fortiori* has the same legal effect as if it had been expressed. We are not concerned here with a legislative vacuum which might be filled by resort to the harsh common law concept of *caveat emptor.* Rather we are concerned with whether the defendant may lawfully append a condition to the sale in contravention of the legislative right to a refund. It is firmly established that municipal liens, and the rights arising therefrom, are solely statutory in origin and are fixed and determined by the statute. See, *e. g., Nordell v. Mantua Tp., supra; Nelson v. Naumowicz,* 1 *N. J.* 300, 302 (1949); *Absecon Land Co. v. Keernes,* 101 *N. J. Eq.* 227, 231 (*E. & A.* 1927). It is elementary that any attempt by a municipality to interpolate or add material conditions in contravention of the legislative grant pursuant to which it purports to act is *ultra vires.* See, *e. g., Edwards v. Mayor & Council of Borough of Moonachie,* 3 *N. J.* 17, 21–22 (1949). This is especially true of any attempt to materially vary or alter the terms and conditions set forth by the

Legislature with respect to tax sales. 16 *McQuillin, Municipal Corporations* (*3d ed.* 1949), § 44.159, and cases cited therein.

The primary problem is to construe the statute. If, as we have demonstrated, the statute contemplates a refund, the municipality cannot will otherwise.

The judgment appealed from is reversed and the cause remanded for entry of a judgment consonant with the views expressed in this opinion. The parties will bear their own costs.

WEINTRAUB, C. J. (concurring). I join completely in the opinion of Mr. Justice BURLING. My purpose here is to add some observations with respect to the suggestion that even though the statute does not contemplate a forfeiture in the event of redemption, yet that result must follow because of a condition first announced at the time of the actual sale.

I would not read the condition to have any relation to the subject of redemption. The words used were that "no claim for any refund of any part of the purchase price for any reason whatsoever need be recognized by the Township." They were expressed immediately after a statement that there were no representations as to the area or acreage or the physical condition or location; that the sale was of the certificate and the township's interest in the lands covered thereby "as is"; and that the purchaser would receive an assignment of the certificate and not a deed. The critical condition, fairly viewed, related to the conditions of sale which preceded it. No reference was made to the subject of redemption.

I find no stipulation or concession that plaintiffs understood the condition to mean there would be no refund in the event of redemption. Nor did the trial court so find. In their brief before us plaintiffs urged there was no proof that they or any other bidder understood the condition to have the purport thus attributed to it. And defendant in its brief before us relied solely upon its interpretation of

the statute, with no suggestion that if that interpretation is erroneous, it ought to prevail upon some other basis. At any rate, I will assume for discussion that the condition in question was both intended and understood to mean that there would be no refund in the event of redemption.

Of course, if that view be accepted, it should logically follow that plaintiffs could not obtain a refund even in the amount paid in redemption, because the condition is absolute in terms—it would bar any refund whatever. Hence it should follow that defendant may retain both the amount of the bid and what it received from the owner who redeemed. Indeed, if the cases cited in the dissent are applicable, it would be illegal for defendant to part with a penny of the grand total.

I see no relevancy here of the doctrine of *caveat emptor* or the subject of quitclaim and warranty deeds. The issue is not whether plaintiffs may complain that defendant had a lesser interest than it purported to sell or that plaintiffs misunderstood the quality or *quantum* of what was sold. Rather the question is, what effect should be given to a subsequent event, *i. e.,* redemption by an owner or party in interest? Nor do plaintiffs suggest that defendant warranted there would be no redemption and hence should be liable to plaintiffs for the gain they would have made if no redemption had occurred. All that plaintiffs want is a return of their money because the act of redemption by a third party prevented the parties to the sale of the certificate from completing their respective undertakings under the statute, namely, a foreclosure by plaintiffs within the stipulated time and the delivery by defendant to plaintiffs of the tax sale certificate after the entry of judgment of foreclosure as required by *N. J. S. A.* 54:5–114.7.

The crux is whether, if it be agreed that the Legislature did not intend redemption to result in forfeiture, a municipality may make it a term of the sale. The terms of the sale are legislatively prescribed. They appear in *N. J. S. A.* 54:5–114.2(*a*) as a statement of what shall be set forth in the public notice of sale. Those terms contemplate a sound,

businesslike transaction. The issue then becomes whether a municipality may, as Mr. Justice BURLING points out, convert the transaction into a gambling event.

If the condition here involved may be imposed, it would follow that a municipality may provide that the sum paid shall be forfeited upon any eventuality it may select, be it the appearance of the ground hog or the outcome of the world series, or stipulate that the price shall be double or nothing on the spin of a wheel. These suggestions are bizarre, of course, but in kind they are indistinguishable from a stipulation that a forfeiture shall depend upon the future behavior of the owner of the property. There can be no power in a municipality to convert a sale into a raffle, and it would be against public policy to enforce any such attempt. That kind of conduct can only defeat the objective of competitive bidding. The Legislature required competitive bidding to the end that the municipality would reap the greatest possible yield. A municipality may not fritter away municipal assets by wager. I say "fritter away" because the small windfall which the municipality would gain in this case is picayune compared with the losses which in the long run must ensue from the inevitable restraint upon bidding.

JACOBS, J., joined by FRANCIS, J. (dissenting). The plaintiffs bid more than the taxes due in the hope that the owner would not redeem and that they would profit accordingly. The owner did redeem and the plaintiffs now seek to recover from the township the difference between the taxes paid by the owner and the amount paid by them on their bid. They admit that the public sale was conducted upon the announced condition that no bid less than the taxes due would be accepted; that no representations were being made as to area, acreage, condition and location; that the township was selling only whatever interest it had in the property; that no deed other than an assignment of the tax sale certificate would be given, and that "no claim for any refund of any part of the purchase price for any

reason whatsoever need be recognized by the township." Apparently this condition has been consistently used and has been indiscriminately applied by the township in its public sales of tax sale certificates during recent years and its business purpose was quite evident—the township was seeking to obtain usable cash which it could commit and disburse for proper municipal purposes without fear or danger that it might later be obliged to return it.

In the Chancery Division the parties submitted the matter on a stipulation which did not suggest that the township had not acted in good faith or that the plaintiffs were not aware of the purpose and effect of the condition. Their complaint omitted all mention of the condition but the township's answer expressly set it forth as a separate defense upon which it would rely. In the pretrial order the plaintiffs made no attack on the condition but advanced the contention that the statute permitting the public sale is "unconstitutional insofar as no provision is made for the return of the difference between the taxes actually due and the purchase price paid on such public sale." The opinion by Judge Wick in the Chancery Division indicates that this was the single contention advanced by the plaintiffs before him; he soundly rejected it and it has been abandoned by the plaintiffs who now urge that the condition was illegal or *ultra vires*. They refer to no statutory or decisional law which so declares and a fair reading of the majority's opinion discloses that there is none. *N. J. S. A.* 54:5–114.2 expressly authorizes the governing body of a municipality to sell certificates of tax sale at public sale, and although it makes no reference to conditions, it seems to us that it is fairly to be construed as authorizing the municipality to announce proper conditions for its own protection. See *Const.* 1947, *Art.* IV, § 7, *par.* 11. In any event, the plaintiffs, acting on their own volition, chose to bid at the public sale with full knowledge of the condition; and the majority now holds that despite the good faith and reliance of the township and the voluntary participation and payment by the plaintiffs, the condition may at this late date be dis-

regarded at the plaintiffs' behest and the township may be obliged to make repayment to them. This holding, which furnishes a precedent for the institution of similar actions by other purchasers, tends to jeopardize the municipal finances and, in the light of the particular circumstances, appears to be neither just to the people of the township nor consistent with the common law approach in related situations. See *Manor Real Estate & Trust Co. v. City of Linden*, 8 *N. J. Super.* 114 (*App. Div.* 1950); *Tooker v. Roe*, 44 *N. J. L.* 591 (*Sup. Ct.* 1882); *Casselbury v. Inhabitants of Piscataway Tp.*, 43 *N. J. L.* 353 (*Sup. Ct.* 1881); 16 *McQuillin, Municipal Corporations* (*3d ed.* 1950), § 44.172, *p.* 438.

The common law gave full recognition to the concept that purchasers of tax sale certificates are speculators who generally seek large profits upon small investments and who may fairly be treated as acting at their peril; in many instances it denied their claims for refunds even where they may have been innocently misled. Thus in *Manor Real Estate & Trust Co. v. City of Linden, supra,* the plaintiff purchased tax sale certificates and later learned that the property was tax exempt and that his certificates were valueless. He sought to recover from the city but his claim was denied in an opinion by the Appellate Division which pointed out that in the tax sale proceedings the city had made no covenants and had merely purported to assign whatever interest it had in the property and nothing more. In *Casselbury v. Inhabitants of Piscataway Tp., supra,* the plaintiff sought to have a tax sale set aside in order that he might thereafter obtain a refund; in rejecting his claim the former Supreme Court, through Justice Dixon, had this to say (43 *N. J. L.* at *page* 354):

"The object of the prosecutors in seeking to have the sale annulled is to prepare the way for a suit to recover from the township the purchase money paid on the sale. It is not denied that the township had the power to tax and to sell for taxes, that the taxes were actually levied and were unpaid, that a sale was actually made, and that there was no fraud or imposition, and no warranty; it is merely alleged that there was illegality in the method of procedure.

The rule of law applicable to such a case is that the municipality is under no obligation to refund the purchase money because the tax title fails; the purchaser is a volunteer, and buys at his own risk. *Lynde v. [Inhabitants of] Melrose*, 10 *Allen* 49 [92 *Mass.* 49]; *Cooley on Tax.* 572."

In *City of Wilmington v. Merrick*, 234 *N. C.* 46, 65 *S. E.* 2d 373 (1951), the purchaser at a tax foreclosure sale sought a refund from the city on the ground that there had been a failure of title; relief was denied to him in an opinion which read in part as follows:

"The principle of *caveat emptor* applies with all its rigor to the purchase of real estate at a tax sale. Ordinarily, the holder of a tax deed executed pursuant to an invalid commissioner's sale in a tax foreclosure suit may not obtain reimbursement from the taxing authorities.

The fundamental fairness and soundness of this rule is apparent. One who purchases at a tax sale does so without warranty,—and usually with the expectation of substantial profit. * * * it would seem to be unsound public policy to require local taxing units to underwrite the validity of these tax titles. Any such requirement would tend to render uncertain, if not to imperil, public finances."

In *Petters & Co. v. Nelson County*, 68 *N. D.* 471, 281 *N. W.* 61 (1938), the state contracted to sell property in Nelson County, and thereupon the county levied taxes on it. Upon default in the payment of taxes the county conducted a delinquent tax sale and sold the property to the plaintiff, who received a tax sale certificate. Thereafter the state cancelled its contract of sale and the plaintiff sought a refund from the county. In denying his claim the court held that the rule of *caveat emptor* was applicable and that a subsequent legislative enactment which sought to allow the refund could not constitutionally be applied to the prior tax sale since that would be a donation to the plaintiff of "moneys from the public treasury to which he had neither a legal, an equitable, or a moral right." See *Atlantic Municipal Corporation v. Auditor General*, 304 *Mich.* 616, 8 *N. W.* 2d 659 (1943); *Anderson v. King County*, 200 *Wash.* 354, 93 *P. 2d* 284 (1939); *Annotations*, 77 *A. L. R.* 824 (1932), 116 *A. L. R.* 1408 (1938).

It may well be that in the aforecited cases there were no express conditions fairly cautioning the bidders that their quest for extraordinary gains entailed commensurate risks and the bidders may have acted under misapprehensions which might under more modern concepts furnish persuasive basis for equitable relief. But in the instant matter there admittedly was a comprehensive condition which was not objected to by any of the bidders and which obviated the danger of misapprehension. Under the circumstances the plaintiffs are in no just position to disavow the adverse terms of the transaction in which they voluntarily engaged. See *Taylor v. City of Haverhill*, 316 *Mass.* 380, 55 *N. E.* 2*d* 617 (1944):

"The plaintiff contends that the condition as to future confirmation was one not contemplated by the statute, and, since it was not contained in the notice of the sale, was void. See *Parrotta v. Hederson*, 315 *Mass.* 416, 53 *N. E.* 2*d* 97. But whether the custodian had a right to make that condition one of the terms of sale or not, he actually did so, and the bids were made and received accordingly. The plaintiff, having bid upon that condition, cannot now maintain that that condition did not exist."

In *Camden v. Green*, 54 *N. J. L.* 591 (1892), the Court of Errors and Appeals went much further than is suggested here in barring recovery of a payment made to a municipality which acted under conditions alleged to be illegal or *ultra vires*. The plaintiff sought a license from the City of Camden's excise board and tendered the sum of $300. The board in good faith claimed $500 although the proper fee was only $300. Thereupon, the plaintiff paid $500 to the city and sought recovery of $200. His claim was denied in an opinion which stressed that the plaintiff was at liberty to accept or decline the license, that his acceptance and payment were voluntary, and that policy dictates the denial of a claim for refund where the payor voluntarily makes his payment to the municipality with full knowledge of all the facts and conditions. See *Rutgers Chapter, etc. v. City of New Brunswick*, 129 *N. J. L.* 238, 239 (*Sup. Ct.* 1942), affirmed 130 *N. J. L.* 216 (*E. & A.* 1943); *Shoemaker & Co. v. Board of Health*, 83 *N. J. L.* 425, 427 (*Sup. Ct.* 1912).

The majority opinion seems to take the position that the granting of the plaintiffs' claim for refund is desirable from a policy viewpoint in that it will reduce the gaming or speculative aspect of their transaction and will encourage future bidding. But on a parity of reasoning, the granting of all claims for refunds where the purchasers fail to obtain title will further reduce the gaming or speculative aspects of their transactions and encourage future bidding. It seems to us that, if for any reason the traditional quitclaim sales are ever to be converted into warranty sales with their consequent financial burdens on municipalities, the Legislature may properly be expected to do so in unequivocal terms.

We would affirm the judgment entered in the Chancery Division.

WEINTRAUB, C. J., concurring in result.

*For reversal*—Chief Justice WEINTRAUB, and Justices HEHER, BURLING and PROCTOR—4.

*For affirmance*—Justices JACOBS and FRANCIS—2.