## IN THE MATTER OF THE APPLICATION FOR EXPUNGE-MENT OF THE COMMITMENT RECORDS OF D. G.

Juvenile and Domestic Relations Court
Essex County

August 1, 1977.

*Mr. David Lazarus* (Community Mental Health Law Project), attorney for D. G.

*Mr. Frank Tunnero,* Assistant Essex County Counsel, attorney for Peter G. Stewart, Essex County Counsel.

APTER, P. J. J. D. R. C. The matter presently before the court is a petition for the expungement of records of commitment of one D. G. pursuant to *N. J. S. A.* 30:4–80.8 *et seq.* The statute provides that:

Any person who has been, or shall be, committed by order of any court or by voluntary commitment, to any institution or facility providing mental health services and who was, or shall be, discharged from such institution or facility *as recovered* may apply to the court by which such commitment was made by verified petition setting forth the facts and praying for the relief provided for in this act.

The issue presently before this court concerns the construction to be given this statute, viz., whether a person has been discharged as "improved" may fall within the ambit of the statute, which states that such persons applying to expunge records of commitment be discharged as "recovered."

The facts, for purposes of this hearing, are essentially as follows. Petitioner was born in 1920. He graduated from high school and was drafted into the Air Force, was honorably discharged, is married and has an emancipated son. Upon discharge petitioner secured employment as a machine operator, a job which he held for 18 years until his hospitalization in 1964.

On August 27, 1964, at age 44, petitioner was committed, by court order, to the Essex County Hospital Center in Cedar Grove. His diagnosis upon admission was that of paranoid state. Although petitioner was home on passes for most of the latter part of his hospitalization, he was not officially discharged until April 29, 1970. Petitioner's diagnosis upon discharge was "Paranoid State Improved."

Petitioner's hospital record during this period reveals that he had been brought to the hospital by his wife because of anxiety and fears that he was being poisoned and, although he was initially described as suspicious and distrustful, he did not display systematized delusions. His wife stated at that time that his illness seemed to be an accumulation of things

that had happened throughout the year, but for six weeks prior to the hospitalization his anxiety and ideas of persecution had become acute.

In the few years prior to his hospitalization in 1964 several deaths of close relatives occurred in rapid succession which put a great deal of pressure on him. As petitioner and his wife were close, family-oriented people, these deaths aroused great concern in petitioner, and he began to have notions of his own life being in jeopardy.

Although petitioner did not believe that there was any particular conspiracy or that particular people wanted to harm him, he did feel very strongly that the world was hostile and that there were people who wanted to harm him. These feelings became very real to petitioner, and he was unable to continue working and finally refused to leave the house. It was at this point that petitioner's wife sought help for her husband, which resulted in his commitment to the Essex County Hospital Center.

Upon admission petitioner was started on medication and began to improve. By December of 1964 he was started on home passes and described as being much improved. The following month hospital progress notes stated that his replies were relevant and coherent, and the patient was free of hallucinations. In February 1965 petitioner was described as accessible and friendly, he did not exhibit fear or excessive anxiety, and his replies were relevant and coherent. Progress notes from 1965 until petitioner's discharge in 1970 consist almost entirely of records of his home passes in care of his wife. He was finally officially discharged as "improved" on April 29, 1970. It was further noted at this time that petitioner's illness was in "good remission."

This hospitalization has been petitioner's first and only hospitalization for psychiatric reasons. He had no contacts with the mental health system prior to this episode or since

his discharge. He has maintained steady employment since his discharge.

Petitioner's expert testified that most persons requiring hospitalization suffer from schizophrenic or manic-depressive psychosis. Developments in the field of mental health have been so significant that the labels and nomenclature, as well as theoretical orientations, have substantially changed in recent years. Petitioner's diagnosis on admission of "paranoid state" in 1964 is no longer recognized as a diagnostic label and, if petitioner were committed to a psychiatric hospital today (which might not even be necessary in light of advancements in treatment), he more than likely would be diagnosed schizophrenic.

Schizophrenia, a disease marked by the patient's break with reality, is nonfunctional; that is, there is no organically identifiable disease, and most psychiatrists feel that it is a lifelong illness, although its symptoms may abate for years or a lifetime. Therefore, no recovery, in a most literal sense would be possible.

In petitioner's expert's opinion the nomenclature is of the least importance. The terms "recovered" and "improved" in this case are interchangeable and both terms would be used to describe that stage of recovery petitioner had attained when he was discharged in 1970.

In addition, counsel for petitioner has submitted excerpts from medical texts written by the closest students of schizophrenia. They observe that some episodes are of a mild, fleeting nature, with no subsequent recurrence. However, in many instances the favorable outcome should be characterized as "social recovery" rather than as "cured" or as a full recovery. This merely means that the patient is able to return to his previous social environment and to previous or equivalent occupation, but with minor symptoms and signs.

One of the authorities address the issue as to whether schizophrenia is curable. Cure is defined as a return to the state that existed prior to the onset of the illness. If by cure is meant the re-establishment of relatedness with

others, satisfactory intimacy with a few human beings and reorganization of the personality, which includes a definite self-identity, a feeling of fulfillment of purpose and hope, then the answer is yes. However, if by cure it is meant a state of immunity with no possibility of recurrence later in life, the authorities were not yet in a position to give an absolute guarantee.

All authorities agree, however, that in cases in which a complete cure cannot be obtained they can nevertheless achieve a level of living where social relations, conjugal rapport and work activities are possible to a level matching or surpassing the one prevailing prior to the psychosis.

Did the Legislature, therefore, intend only to provide relief under this statute to those who, in the strictest sense of the word, had recovered? Could the Legislature have foreseen the changing trends and concepts in the field of mental health when the statute was enacted?

It is a basic concept of our law in interpreting statutes that "the intention [of a statute] emerges from the spirit and policy of a statute rather than from the literal sense of the particular terms." *Caputo v. The Best Foods,* 17 *N. J.* 259 (1955). See *Dvorkin v. Dover Tp.,* 29 *N. J.* 303 (1959). "In construing the statute the court must look to the overall intent and purpose of the law." *Matter of Vacancies in Municipal Government of Rutherford,* 140 *N. J. Super.* 328 (Law Div. 1976).

The underlying intent of *N. J. S. A.* 30:4–80.8 *et seq.* is to eliminate any stigmas that might attach to a person who was committed to a psychiatric hospital. *In re H.,* 151 *N. J. Super.* 372. (Juv. & Dom. Rel. 1977) In allowing a person to answer questions under oath as if the commitment had never occurred (*N. J. S. A.* 30:4–80.11) the Legislature clearly intended to place petitioner in the same position he was in before the hospitalization and illness occurred, with a view toward eliminating to the greatest possible extent petitioner's exposure to discrimination. Testimony shows that petitioner has reached that stage of recovery

that allowed him to function normally in a community setting for a sustained period of time prior to this application. We usually perceive the meaning of recovered as regaining something that we lost, *The New Merriam Webster Dictionary,* or, in the context of this proceeding, regaining a balance, composure or soundness of mind.

There is no question from the testimony elicited at trial that petitioner did, in fact, regain a psychiatric balance and soundness of mind, and it is this restoration which forms the spirit and policy in the statute. No other conclusion could be reached when we consider the nature of this psychiatric illness within the context of medical reality and its transistory theoretical orientation and nomenclature.

Therefore, this court must render a decision based on the intention, spirit and policy of the statute rather than the literal sense of its particular terms, *Caputo v. The Best Foods, supra,* and consonant with ongoing changes in orientation and nomenclature within the psychiatric profession.

Petition granted.