# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1410-23

IN THE MATTER OF THE
EXPUNGEMENT OF THE
MENTAL HEALTH
RECORD OF T.B.

_____

Argued February 24, 2025 – Decided June 25, 2025

Before Judges Berdote Byrne and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Burlington County, Docket No. L-0755-23.

Christopher G. Olsen argued the cause for appellant T.B. (Schwartz, Hanna, Olsen and Taus, PC, attorneys; Christopher G. Olsen, of counsel and on the briefs).

James K. Grace, argued the cause for respondent County of Burlington (Malamut and Associates, LLC, attorneys; James K. Grace, on the brief).

PER CURIAM

T.B.[1] appeals a December 12, 2023 order denying a motion to expunge mental health records prepared and maintained in connection with his civil commitment in 1983 to Ancora Psychiatric Hospital ("Ancora") in Winslow Township, New Jersey.[2] T.B. argues the trial court improperly relied on his current physical condition, age, and stated reasons for seeking expungement in reaching its decision. We disagree and affirm.

I.

In May 2023, T.B. moved to expunge records held by the Superior Court of his four-day involuntary commitment to a psychiatric hospital in July 1983. Toward that end, the trial court scheduled a testimonial hearing.

The hearing was conducted on dates in August and October 2023. The court admitted in evidence medical records pertaining to T.B.'s prior commitment, as well as documentation provided by Dr. David Dada, a

---

[1] We use initials to protect the identity of the appellant and to preserve the confidentiality of the proceedings. R. 1:38-3(f)(2).

[2] Although T.B.'s petition originally sought expungement of records held by the Burlington County Superior Court, Burlington County Adjuster's Office, Burlington County Prosecutor's Office, and Ancora, his counsel adduced documentation reflecting the hospital records once in the possession of county entities no longer exist. Accordingly, counsel for T.B. reached accord with counsel for Burlington County that his application would be limited to the psychiatric records maintained by the Superior Court.

A-1410-23

psychiatrist who evaluated T.B. in connection with his expungement application. T.B. was the sole witness to offer testimony at the hearing.

T.B. explained what prompted his expungement application: "Well, I applied . . . to purchase a gun for target practice with my friends, and I was denied, and I wondered why." After discovering that the denial was attributable to his prior psychiatric commitment, T.B. initiated proceedings to have the records expunged.

Concerning his hospitalization, T.B. testified, "my adulteress [ex-]wife gave me some pills that I took, and then had me hallucinating pretty badly. So they sent me down to Ancora, because she said I tried to kill her, amongst other things. And after being questioned, they determined that I didn't belong there, and they released me."

Asked by the court how he came to be evaluated about his current mental health status, the following colloquy ensued:

> COURT: So, do I understand your testimony this morning to be that between 1983, when you were released from Ancora, and June of 2022, you didn't have any psychiatric or psychological treatment?
>
> T.B.: No Ma'am.
>
> COURT: Why did you go to LifeStream in June of 2022?

A-1410-23

T.B.: Well, I needed to have some kind of a letter stating that I wasn't crazy or dangerous to other people or myself.

COURT: All right. I'd like to go over those records with you a little bit. You went to LifeStream and saw Dr. Dada –

T.B.: Yes.

COURT: -- on June 1st 2022, and you told him that you had anxiety?

T.B.: Well, that was really just to get him to see me.

COURT: You didn't have anxiety?

T.B.: No, Ma'am.

COURT: Then why did you tell him you had anxiety?

T.B.: Like I said, so he would see me. He was kind of fussy about who he saw for patients.

The court reviewed Dr. Dada's June 2022 evaluation report. The doctor found T.B. "very talkative," "shaky/trembling," "feeling angry," in "too much pain," and experiencing "memory problems." In his August 14, 2023 evaluation, Dr. Dada diagnosed T.B. with "an adjustment disorder and anxiety," but concluded he was neither "manic or psychotic" nor "a danger to himself or others." The court also considered an October 2023 letter authored by a nurse

4

practitioner stating T.B. was in "good physical, psychological, and mental condition" and received medication for diabetes and hyperlipidemia.

The court questioned T.B. about the medications he was taking:

COURT: It also says, here, that they did some medication counseling with you. And it says, "Discussed risk of potentially fatal overdoes if psychiatric medication is taken with alcohol, narcotic pain medication or in quantities greater than prescribed." So, did they -- when you went to see him, were you on any psychiatric medication?

T.B.: No.

COURT: Did he prescribe any on that date?

T.B.: No.

COURT: Then you went, about a month later, in July for a brief medication review. And, again, that same statement about "discussed risk of potentially fatal overdose." Did the doctor prescribe any medications for you on that date?

T.B.: No.

COURT: And then, about three months later, on October 13th, you went back, and the same discussion of medication counseling. Did he prescribe any medication for you then?

T.B.: No.

COURT: All right.

T.B.: It never came up.

A-1410-23

COURT: Okay. Do you take any medications?

T.B.: Just for my diabetes. And, let's see, what else? Cholesterol.

COURT: Okay. Anything else?

T.B.: They had me on some type of a blood pressure pill to keep me from going over the numbers.

COURT: Are you still on that?

T.B.: Yeah. I understand that's a lifetime thing, blood pressure.

COURT: What's the name of the blood pressure medication?

T.B.: I need to get my wife in here. She does all that for me.

The Trial Court's Findings and Conclusions

Following the hearing, the court rendered its findings of fact and conclusions of law. It noted that pursuant to the controlling statute, N.J.S.A. 30:4-80.8, it was required to determine whether T.B.'s mental health had substantially improved or was in remission. Although it acknowledged T.B. had no history or mental health treatment beyond his hospitalization in 1983, the court also observed that because the commitment occurred forty years ago, it was difficult to assess his condition at that time with certainty. The judge gave

6

little weight to the October 2023 letter written by the nurse practitioner attesting to T.B.'s "good physical, psychological, and medical condition," noting it was not a certified medical document, did not include an actual examination, and contained only general conclusions rather than detailed medical findings.

The trial court found that credibility concerns, incomplete medical records, and T.B.'s limited awareness of his physical condition and medications collectively caused reasonable doubt as to his threat to public safety. The court recounted:

> [T.B.] told the people [at LifeStream] that he was suffering from anxiety and depression. And he said he did that because that was what he had to say -- or that's what he thought he had to say in order to get this appointment so that he could get the evaluation. And a concern to me is that he was not particularly honest with these folks about why he wanted this evaluation.

T.B.'s problematic interaction with LifeStream staff raised questions in the court's mind about T.B.'s "candor to the [c]ourt and fundamental issues that are here." In that vein, the judge took issue with T.B.'s dismissive characterization of the nature of his hospitalization at Ancora versus the hospital record; namely, that after questioning, the staff released him. The medical documentary evidence stated:

> In the report it says, "unable to contain on open unit; violent outbursts; threatening; severely agitated;

 A-1410-23

threatening others; yelling; demanding; attempted to strangle his wife at home; violent outbursts; tried to tear side rails off of the [bed]." So, this is not a man who, you know, showed up at Ancora mildly agitated or upset, but described by the doctors down there as threatening behavior, so agitated they couldn't talk to him and violent outbursts towards the people on the staff there.

Regarding his present condition, the court noted that despite the medical reports stating he was stable, T.B. exhibited signs of memory problems and a lack of awareness regarding his own medication regimen.

The court ultimately denied T.B.'s petition, concluding that expungement would be contrary to the public interest. In this regard, a key finding of the trial court was that T.B.'s mental health was

> of major concern[.] [T.B.] doesn't even know what medication he's taking for his [d]iabetes or for his high cholesterol situation or his [h]yperlipidemia. And that, to me, speaks volumes about not that he's dangerous to the public safety, but that why would we give -- why would we give an 80-year-old man, who can't even be responsible for his own health, access to a firearm that he wants to use for target practice with his friends. You know, is he going to forget that he -- that he didn't -- is he going to forget to put the safety on the firearm when he isn't at the range doing target practice? Is he going to forget to secure it in his home so that people who come to visit don't have access to it? That's what's really of concern to this court.
>
> . . .

A-1410-23

So, I mean, that was of great concern to me, because we have here an 80-year-old man who has trouble getting around -- he told me that -- who doesn't know what medication he's taking and couldn't remember what medication he was taking, who leaves it to somebody else to take care of it for him. And I think that all of that belies the statement in this letter that he's in good physical, psychological and mental condition.

. . .

We're talking about a man who, apparently when he turned 80 years old, he decided that target practice was going to be his new activity, not that I know what other activities he's involved in. But it certainly doesn't appear that he's involved in too many other activities. So, there are enough gaps in what's going on in this record that I am not able to find that the grant of relief is not contrary to the public interest. And [T.B.]'s application for the expungement of his mental record is denied.

Following the trial court's denial, T.B. filed a timely appeal.

II.

We review issues governing expungement of mental health records de novo. In re Kollman, 210 N.J. 557, 577-78 (2012). "A trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019). However, the trial court is given deference to findings of fact based

9

on their opportunity to hear live testimony. In re Civil Commitment of R.F., 217 N.J. 152, 174-75 (2014).

A person seeking to expunge a mental health record resulting from a civil commitment may do so pursuant to N.J.S.A. 30:4-80.8, which states in pertinent part:

> Any person who has been, or shall be, committed to any institution or facility providing mental health services, or has been determined to be a danger to himself, others, or property, or determined to be an incapacitated individual as defined in N.J.S.3B:1-2, by order of any court or by voluntary commitment and who was, or shall be, discharged from such institution or facility as recovered, or whose illness upon discharge, or subsequent to discharge or determination, is substantially improved or in substantial remission, may apply to the court by which such commitment was made, or to the Superior Court by verified petition setting forth the facts and praying for the relief provided for in this act.
>
> [(N.J.S.A. 30:4-80.8) (Emphasis added).]

In substance, the person seeking the expungement has the burden to demonstrate that their illness has either "substantially improved" or is in "substantial remission" since their discharge from a mental health facility. Ibid.

Pursuant to N.J.S.A. 30:4-80.9, the court is also directed to consider a number of factors which in turn determine whether a petitioner "will not likely

act in a manner dangerous to the public safety" and whether to grant the expungement "is contrary to the public interest":

> [T]he court shall hear evidence as to: the circumstances of why the commitment or determination was imposed upon the petitioner, the petitioner's mental health record and criminal history, and the petitioner's reputation in the community. <u>If the court finds that the petitioner will not likely act in a manner dangerous to the public safety and finds that the grant of relief is not contrary to the public interest</u>, the court shall grant such relief for which the petitioner has applied and, an order directing the clerk of the court to expunge such commitment from the records of the court.
>
> [(N.J.S.A. 30:4-80.9) (Emphasis added).]

Encompassed in this analysis is the reason the person was committed in the first instance, the person's mental health and criminal record, and the person's reputation in the community. The statute does not specifically provide for additional factors a court may elect to consider, nor does it list factors a court is prohibited from considering.

In construing a statute, a court "must look at the overall intent and purpose of the law." In re D.G., 162 N.J. Super. 404, 408 (1977). A search for the legislative intent begins with an expungement statute's structure and language. In re J.D., 407 N.J. Super. 317, 322 (App. Div. 2009). It is also "a basic concept of our law in interpreting statutes that the intention [of a statute] emerges from

the spirit and policy of a statute, rather than from a literal sense of its particular terms." D.G., 162 N.J. Super. at 408. We have previously held that the intent of the provisions of N.J.S.A. 30:4-80.9 "is to eliminate any stigmas that might attach to a person who was committed to a psychiatric hospital." J.D., 407 N.J. Super. at 323 (citing D.G., 162 N.J. Super. at 408). The remedy of expungement is intended to "eliminat[e] to the greatest possible extent the petitioner's exposure to discrimination." D.G., 162. N.J. Super. at 408.

Here, the trial court acknowledged that the forty-year interval between T.B.'s 1983 hospitalization and subsequent evaluation was substantial, rendering problematic a finding as to whether T.B.'s condition was "substantially improved" or was in "substantial remission" pursuant to N.J.S.A. 30:4-80.8. The trial court acted within its discretion in connecting T.B.'s plain lack of credibility to its assessment of this threshold issue, stating:

> What we do have is what these people at LifeStream have been saying now, and on the assumption that [T.B.] was honest with them, which is, you know, a great leap of faith in this case, since we know he hasn't been honest with them before. (Inaudible) has had no mental health treatment since that time, and but I don't know if that means that his condition is substantially improved or in substantial remission.

Under these circumstances, the court properly and decisively focused on the factors set forth in N.J.S.A. 30:4-80.9, namely public safety and public

12

interest. Its findings were adequately supported by substantial evidence in the record. The court fairly exercised its fact-finding authority in noting the contradiction between T.B.'s version of the circumstances of his hospitalization and the clinical record. Likewise, contrary to T.B.'s contention, in reaching its determination regarding public safety, the trial court reasonably expressed concern about T.B.'s limited understanding of his own physical condition and necessary medications.

In sum, we agree the trial court reasonably determined that defendant failed to meet its burden to demonstrate the expungement was in the public interest.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

13