**IN RE: GGI PROPERTIES, LLC, Debtor.**

**GGI Properties, LLC, Plaintiff,**

**v.**

**City of Millville, Defendant.**

**Case No.: 16–14328–ABA
Adv. No.: 16–1202–ABA**

United States Bankruptcy Court, D. New Jersey.

Hearing Date: March 28, 2016

Signed June 7, 2017

Ira Deiches, Deiches & Ferschmann, Haddonfield, NJ, Todd W. Heck, Testa Heck Testa & White, P.A., Vineland, NJ, for Plaintiff.

Nona Ostrove, Law Offices of Nona L. Ostrove, LLC, Voorhees, NJ, for Defendant.

## MEMORANDUM DECISION

Andrew B. Altenburg, Jr., United States Bankruptcy Judge

### I. INTRODUCTION

This matter is before the court on the motion of the City of Millville (the "City") for summary judgment. Through its adversary proceeding complaint, the Debtor, GGI Properties, LLC ("GGI"), seeks to avoid the transfer of a parcel of real estate located in the City, after the City, pursuant to New Jersey's tax sale laws, foreclosed on the property due to unpaid real estate taxes. GGI alleges that the transfer is avoidable as a constructively fraudulent transfer and/or as a preference and seeks recovery. The City argues that the Su-preme Court's holding in *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("BFP"), applies to preclude avoidance and/or such an avoidance would impinge on state court rights. Alternatively, if the court disagrees with those arguments, it asserts that GGI received reasonably equivalent value in exchange for the transfer.

After careful review of the submissions of the parties, the relevant case law concerning third party purchasers pursuant to a tax sale and foreclosure, and statutes, the court determines that a transfer of property to a municipality pursuant to a tax sale and foreclosure, where there was no competitive bidding, can constitute a fraudulent conveyance under 11 U.S.C. § 548(a)(1)(B), and is not barred by the United States Supreme Court's holding in *BFP*. Likewise, this court further concludes that the transfer may also constitute an avoidable preference under 11 U.S.C. § 547(b). Finally, the court finds that there is a genuine issue of material fact regarding the value of the property transferred and, if necessary, what would be an appropriate remedy, thus the summary judgment motion must be denied.

### II. JURISDICTION AND VENUE

The court has jurisdiction over this contested matter under 28 U.S.C. §§ 1334(a) and 157(a) and the Standing Order of the United States District Court dated July 10, 1984, as amended October 17, 2013, referring all bankruptcy cases to the bankruptcy court. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(F), (H). Venue is proper in this Court pursuant to 28 U.S.C. § 1408. The statutory predicates for the relief sought herein are 11 U.S.C. §§ 548(a)(1)(B), 547(b), and 550(a).

## III. BACKGROUND [1]

The property at issue is approximately 18 acres located at 200 G Street, off Route 47, a main road into the City of Millville, site of the former Wheaton Glass Works factory (the "Property"). Doc. No. 18–3, ¶ 5; Doc. No. 20, ¶ 6. GGI obtained the Property through the liquidating chapter 11 plan filed in a bankruptcy case in the Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy") involving GGI's predecessor in interest, The Glass Group, Inc. In the course of that case, a secured claim of the City against the Property was challenged and significantly reduced. Ultimately, the Property was deeded to GGI on September 7, 2006. Doc. No. 18–4, pp. 21–22.

Thereafter, GGI defaulted in payment of taxes to the City in 2009. Doc. No. 18–1, ¶ 3. The City purchased the tax sale certificate on August 12, 2010 for $63,029.19. Doc. No. 18–5, pp. 76–77. On October 21, 2014, the City filed a foreclosure action on the certificate in the Superior Court, Cumberland County. Doc. No. 18–1, ¶ 4. GGI filed an answer that was deemed non-contesting by the court on December 15, 2014. *Id.* GGI filed a motion to have its answer deemed contesting that the Superior Court denied, Doc. No. 24–1, pp. 2–8, and then filed a motion for reconsideration, which the Superior Court also denied. Doc. No. 24–1, p. 11. The Superior Court ruled simply: "Reconsideration is denied. Def [sic] has cited no law in support of his

position that failure to discharge mortgage prevented def from paying real estate taxes." *Id.*

On June 25, 2015 GGI filed its first chapter 11 bankruptcy case in this court. *See* Bankr. Case No. 15–21939–ABA.[2] This court dismissed the case by order dated October 8, 2015 on motion of the U.S. Trustee and after a hearing. *See* Bankr. Case No. 15–21939–ABA, Doc. Nos. 18, 44. Considerations for dismissal included a lack of insurance on the Property and the inability of GGI to find a committed purchaser for the Property. *Id.*, Doc. Nos. 18–2, 18–3.

After the dismissal, the Superior Court entered a final judgment in the tax foreclosure, on December 31, 2015. Doc. No. 18–5, pp. 79–80. According to its tax collector, $429,767.45 in taxes, interest and fees was owed at that time. Doc. No. 18–2, p. 6.[3]

GGI filed its bankruptcy case[4] on March 8, 2016, Bankr. No. 16–14323–ABA, and this adversary proceeding on March 15, 2016. GGI owns no real property and conducts no business. Bankr. No. 16–14323–ABA, Doc. No. 1, pp. 8–9. Other than $51, this lawsuit is its only asset. *Id.*, pp. 9–11, 22. GGI disclosed $372,537 in unsecured claims, including Mr. Rock claiming $332,429 in loans that had been secured by the Property, and Mr. Nave claiming $19,717 in loans. *Id.*, pp. 14–15. Mr. Rock declared under penalty of perjury that he has "agreed verbally with Mr. Nave as the

1. The court understands that there is a long, sordid and contentious history between the City, GGI and/or The Glass Group, Inc. For purposes of this decision, the court will only set forth the facts relevant to this decision.

2. This court can take judicial notice of the existence of its court records and opinions. *M & M Stone Co. v. Pennsylvania*, 388 Fed.Appx. 156, 162 (3d Cir. 2010); *In re Indian Palms Associates, Ltd.*, 61 F.3d 197, 205 (3d Cir. 1995).

3. The City alleges that $514,875.24 is due as of March 1, 2017 and must be paid if the transfer is avoided. Doc. No. 18–2, p. 6.

4. According to its petition, two trusts each own a 50 percent interest in GGI. But interestingly, the sale agreements attached as exhibits to GGI's pleading, Doc. Nos. 20–4 and 20–5, set forth Mr. Nave and Mr. Rock individually as the members of GGI.

Trustee for GGI in the Chapter 11 proceeding[5] that he would subordinate his note and mortgage to all administrative fees, legal fees and unsecured claims filed or arising out of this Chapter 11 proceeding." Doc. 19–1, ¶ 4.

GGI describes the Property as containing buildings that "were previously deteriorating, but since the City has assumed ownership and total control of the property, some of the buildings that had been in reasonably good condition have been allowed to be vandalized to such an extent that they are probably not salvageable." Doc. No. 20, ¶ 6.

The City states that the Property contains "deteriorating" buildings "that have been vacant for at least ten years." Doc. No. 18–3, ¶ 5. It continues that "[t]he derelict buildings are an eyesore that sit at the entrance to the City and desperately need to be rehabilitated or torn down." Id. Further, "[t]he property is an environmental clean-up site with remediation being conducted by Rio Tinto, the corporate successor to Wheaton Glass." Id. See also Doc. No. 20, ¶ 6. It claims it has spent over $20,000 in securing the Property, such as by covering open holes with steel plates. Doc. No. 18–3, ¶ 6.

GGI disagrees that the buildings have been vacant for 10 years, alleging that some had been rented during a portion of the time GGI owned the Property. Doc. No. 20, ¶ 6. But it concedes "[s]ome of the buildings are now an eyesore. They sit at the entrance to the City, and need to be rehabilitated or torn down." Id. However, "[i]t is the expressed intention of GGI's current contract purchaser to rehabilitate the buildings, where practical, and to oth-

erwise tear down the unfit buildings and to restore the property to a useable site." Id. GGI also disclosed on its petition that it has been a party to a proceeding under an environmental law and had notified the New Jersey Department of Environmental Protection on March 13, 2015 of a release of hazardous material. Bankr. Case. No. 16–14328–ABA, Doc. No. 1, p. 23. An appraisal submitted by the City includes the Remediation Agreement entered into by Wheaton USA Inc. (the owner of the Property operated by Wheaton Glass Company) in September 2002. Doc. No. 18–5, p. 87.

Mr. Nave claims that the City has not been cooperative with its attempts to sell the Property. Doc. No. 20, ¶ 7. He attributes this to a "grudge" held by the City dating back to the Delaware Bankruptcy. Id. He avers that "successive" purchasers have been "rebuffed or effectively discouraged" by the City, "even though GGI's most recent scheduled contract purchaser, Anthony DeSantis et al., were also the only responding parties to the City under its separate March 2016 Request for Proposals for redevelopment of the Property issued before this bankruptcy proceeding commenced." Id. Mr. Nave also alleges that "[o]rdered mediation sessions [occurring in connection with this adversary proceeding] were unnecessarily delayed and protracted by the City, with no perceptible intent by the City to meaningfully participate nor to timely accommodate the timing needs of GGI's contract purchasers." Id. The failure to "voluntarily" discharge the 2004 mortgage is another reason Mr. Nave claims the City has "thwart[ed] GGI's good faith attempts to sell the property...." Id., ¶¶ 7–8.[6]

---

5. Mr. Nave is not the Trustee for GGI. He is the trustee for one of the two trusts that purportedly owns a 50 percent interest in GGI.

6. The Settlement Agreement entered into by the parties in connection with the Delaware Bankruptcy provides that *"Upon written request,* Millville shall promptly file and all appropriate documents and instruments releas-

The City notes in response that GGI raised much of this in the state court, but that court rejected those arguments. Doc. No. 24, ¶ 2; Doc. No. 24–1. As for the mediation, the City contends that GGI was at fault for several adjournments. The City also notes that GGI filed a Notice of Lis Pendens covering the Property on March 24, 2016, preventing a sale of the Property during this proceeding. Doc. No. 18–6, ¶ 5.

## A. Various values ascribed to the Property

The parties argue vastly different values for the Property: $0 says the City while GGI alleges "approximately $700,000."

The Glass Group purchased the property on September 20, 2002 from Wheaton USA, Inc. for $1. Doc. No. 18–4, pp. 2–7. As recited above, GGI acquired the Property through that entity's chapter 11 plan in 2006, also for $1. Doc. No. 18–5, p. 20. Three years later, on September 6, 2009, it listed the Property for sale for $1,649,000, a drop from its original list price of $2,970,000. Doc. No.18–5, p. 81. The Property did not sell.

GGI appealed its tax assessment in 2008, obtaining an adjustment from $2,650,000 to $1,676,400. Doc. No. 18–5, p. 33. A few years later it appealed the assessment again with a November 12, 2012 appraisal valuing the Property from $300,000 to $600,000. Doc. No. 18–1, ¶ 2. The appraisal purportedly included a sale contract dated February 2, 2012 for $500,000. Doc. No. 18–5, p. 21. The City then set the assessment at $600,000 as of October 11, 2011,[7]

and it remains at that to this day. Doc. No. 18–1, ¶ 2.

Three subsequent contracts of sale entered into much closer to the December 31, 2015 transfer of the Property to the City provide further suggestions of value. The first is dated January 9, 2015 and was entered into by Community Development, LLC for $700,000. Doc. No. 18–5, p. 21. A contract dated December 15, 2015 entered into with Anthony DeSantis, as agent for an entity to be formed, is in the amount of $530,000. Doc. No. 24–1, pp. 20–31. This was submitted by the City with the statement that GGI had produced it in discovery in this proceeding. Doc. No. 24, ¶ 4. Finally, GGI submitted a contract dated March 17, 2016 with Mr. DeSantis and Linda Salamon, as agents for an entity to be formed, in the amount of $690,000. Doc. No. 20–4, pp. 1–14.[8] The City states that this contract was amended May 13, 2016 to account for the need for bankruptcy approval. Doc. No. 24, ¶ 5. The latter contract dates are after the bankruptcy filing when GGI did not in fact own the Property. It is these contracts that GGI points to as supporting its "approximately $700,000" value.

The City's proposed value of $0 is derived from an appraisal valuing the Property as of July 27, 2016 as "nominal." Doc. No. 18–5. The appraiser summarized that "The site is contaminated, the buildings are dilapidated, and the highest and best use, 'as if unimpaired,' is 'tear down' and redevelopment with a light industrial use." *Id.*, p. 3; *see also* p. 40. He described the improvements on the Property as consist-

---

· ing any lien, security interest or mortgage securing the Millville Claim at Millville's expense." Doc. 18–4, p. 63 (emphasis supplied). Thus the City may not have been under a duty to "voluntarily" discharge the mortgage of record.

7. An exhibit to Mr. Nave's Declaration shows the assessment changing to $600,000 in 2013, not 2011. Doc. No. 20–3.

8. GGI also submitted a contract dated "March 2017" with Mr. DeSantis only for $690,000, but this contract was not signed. Doc. No. 20–5, pp. 1–5.

ing of a former heavy industrial facility used for glass manufacturing, mostly built in the 1920s and in dilapidated condition with most of the stand-alone manufacturing equipment removed. *Id.*, p. 35. "There is no evidence of upgrades or renovations. . . . The property has been shuttered for over ten years." *Id.* The appraiser estimated the unimpaired land value at $200,000, based on reviewing comparable sales. Doc. 18–5, p. 70. He subtracted an estimated $770,000 for demolition and removal, plus $215,000 for asbestos removal, to come to a final unimpaired value of "nominal." *Id.* He also estimated a nominal value for the Property as impaired due to the lack of control over a cross easement to a pond located on the Property into which Gerresheimer Glass, Inc., an adjoining property owner with contaminated Property, is allowed to discharge water from its processing, provided it is not contaminated. *Id.*, pp. 39, 70.

## B. The Complaint

In its First Count, GGI seeks avoidance of the transfer of its Property to the City as a constructive fraudulent transfer pursuant to section 548(a)(1)(B)(i), (ii)(I) of the Bankruptcy Code. Doc. No. 1. It alleges that at the time of the transfer, the taxes, interest and water service charges owed to the City equaled approximately $425,000 while the fair market value of the Property was approximately $700,000. *Id.*, ¶ 7. Thus the transfer returned to it less than reasonably equivalent value. *Id.*, ¶ 17. It further alleges that it had liabilities of $372,537.71 at the time, not including its liability to the City, thus it was insolvent at the time of the transfer. *Id.*, ¶¶ 9, 18.

In its Second Count, GGI seeks avoidance of the transfer as a preference pursuant to section 547(b) of the Bankruptcy Code. *Id.*, ¶¶ 20–25. It alleges that the transfer was a transfer to or for the bene-

fit of a creditor (the City), on account of an antecedent debt owed the City (the taxes), at a time when GGI was insolvent, within 90 days of the filing of the bankruptcy petition. *Id.*, ¶¶ 21–23. It further alleges that the transfer enabled the City to receive more than it would had GGI filed a chapter 7 bankruptcy case, as the Property is worth approximately $700,000 while the debt owed to the City was only approximately $425,000. *Id.*, ¶¶ 7, 24.

GGI sets forth a Third Count pursuant to section 550(a) of the Bankruptcy Code seeking recovery of the Property for the benefit of the estate. *Id.*, ¶¶ 26, 27. In a later submission, it stated that it would accept the value of the Property instead. Doc. No. 19, p. 1. Without any citation to authority for same, it also seeks costs and counsel fees. Doc. No. 1, p. 6.

The City filed an answer admitting that a final judgment in an *in rem* tax foreclosure was entered on December 31, 2015, which was within 90 days of the filing of GGI's bankruptcy petition. Doc. No. 1, ¶¶4, 6; Doc. No. 4, ¶¶ 4, 6. It set forth various defenses, most significantly that a final judgment in an *in rem* tax foreclosure is not subject to avoidance as a fraudulent transfer or as a preferential transfer. *Id.*, p. 5, ¶¶ 8–9.

After mandatory mediation failed to resolve the proceeding, the City on March 3, 2017 filed the Motion for Summary Judgment that is the subject of this Opinion. Doc. No. 18. GGI filed a Brief in Opposition on March 21, 2017, Doc. No. 19, and the City responded on March 27, 2017. Doc. No. 24. The court then advised the parties that it would decide the matters on the papers.

## IV. DISCUSSION

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (incorporated into adversary proceedings by Fed. R. Bank. P. 7056). As the Supreme Court has indicated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed. R. Civ. P. 1). "In deciding a motion for summary judgment, the judge's function is not to weigh the evidence and determine the truth of the matter, but rather to determine if there is a genuine issue for trial." *Josey v. John R. Hollingsworth Corp.,* 996 F.2d 632, 637 (3d Cir. 1993).

> The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Huang v. BP Amoco Corp.,* 271 F.3d 560, 564 (3d Cir. 2001) (citing *Celotex Corp.,* 477 U.S. at 323, 106 S.Ct. 2548). In determining whether a factual dispute warranting trial exists, the court must view the record evidence and the summary judgment submissions in the light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed. 2d 202 (1986). Disputed material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. 2505. A dispute is genuine when it is "triable," that is, when reasonable minds could disagree on the result. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed. 2d 538 (1986) (citations omitted).
>
> Once the moving party establishes the absence of a genuine dispute of material fact, however, the burden shifts to the non-moving party to "do more than sim-

ply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. A party may not defeat a motion for summary judgment unless it sets forth specific facts, in a form that "would be admissible in evidence," establishing the existence of a genuine dispute of material fact for trial. Fed. R. Civ. P. 56(e) (providing that in response to a summary judgment motion the "adverse party may not rest upon the mere allegations or denials of [its] pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine [dispute] for trial"). *See also Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir. 1982); *Olympic Junior, Inc. v. David Crystal, Inc.,* 463 F.2d 1141, 1146 (3d Cir. 1972). If the nonmoving party's evidence is a mere scintilla or is not "significantly probative," the court may grant summary judgment. *Liberty Lobby, Inc., supra,* 477 U.S. at 249–250, 106 S.Ct. 2505. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

*In re Moran–Hernandez,* 544 B.R. 796, 800–01 (Bankr. D.N.J. 2016) (footnote omitted).

### A. Count One—Constructive Fraudulent Transfer

Section 548 provides in relevant part:

(a)(1) The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily— ...

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a) (2017).

Section 101(54)(C), (D) of the Bankruptcy Code provides that "transfer" includes foreclosure of an equity of redemption and an involuntary transfer. The Bankruptcy Code defines "value" for fraudulent transfer purposes as including "satisfaction or securing of a present or antecedent debt of the debtor." 11 U.S.C. § 548(d)(2)(A); *In re Glob. Outreach, S.A.*, 09–01415 (DHS), 2014 WL 4948184, at *10 (Bankr. D.N.J. Oct. 2, 2014).

The City does not dispute that its *in rem* tax foreclosure constituted a transfer of an interest of GGI in property for purposes of section 548. As it was made on December 31, 2015 and GGI filed its chapter 11 petition on March 8, 2016, the transfer was made within two years. But the City asserts that the reasoning of *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994), applies, mandating that reasonably equivalent value was conclusively given. Alternatively, it argues that the amount of taxes satisfied provided reasonably equivalent value.

**1. The *BFP* decision**

■ Since 1994, seemingly all decisions examining fraudulent transfers start with a discussion of the Supreme Court's decision in *BFP v. Resolution Trust Corp.* In *BFP*, the Court determined that reasonably equivalent value in connection with a transfer at a mortgage foreclosure sale was conclusively the amount received at the mortgage foreclosure sale, so long as the state's procedures for that sale were

followed. *Id.*, at 545, 114 S.Ct. 1757. The Court believed that a property sold within the "strictures" of a forced sale is "simply *worth less*" than property sold under normal market conditions. *Id.*, at 539, 114 S.Ct. 1757 (emphasis in original). But it limited its opinion to mortgage foreclosures, stating that "The considerations bearing upon other foreclosures and forced sales (to satisfy tax liens, for example) may be different." *Id.*, at 537, n. 3, 114 S.Ct. 1757.

While at first blush, the lower courts appear to be divided on whether *BFP's* reasoning applies equally in tax sale foreclosures, the court in *In re Smith*, 811 F.3d 228 (7th Cir.), *cert. denied sub nom. Smith v. SIPI, LLC*, — U.S. —, 137 S.Ct. 103, 196 L.Ed.2d 40 (2016), explained why that is not necessarily the case. It described the three methods states generally choose from for collecting delinquent property taxes: the overbid method, the interest rate method, and the percentage ownership method. *Id.*, at 237. In the overbid method, "the bidding price begins at the total amount of taxes and interest due, and potential buyers then offer higher bids up to the total price they are willing to pay in return for (eventual) fee simple title. . . . The fair market value of the property is at least in theory the ceiling for amounts that might be bid. The winner of this competitive bidding receives rights to the property." *Id.* This appears to be the system used by our sister-state, Pennsylvania, where *BFP*'s reasoning has been held to also apply to tax sale foreclosures. *In re Lord*, 179 B.R. 429 (Bankr. E.D. Pa. 1995). *See Crespo v. Abijah Tafari Immanuel (In re Crespo)*, 557 B.R. 353 (Bankr. E.D. Pa. 2016), *aff'd*, 2017 WL 1177186 (E.D. Pa. March 30, 2017).

"In the percentage ownership method, the successful purchaser bids to purchase the tax lien for the lowest percentage own-

ership in the underlying property." *Smith*, at 237, n. 1 (internal quotation omitted). The *Smith* court commented that Iowa uses this method. *Id.*

Finally, *Smith* described the interest rate method as used in Illinois, the state at issue in the *Smith* appeal. There,

bidders vie to purchase the tax lien, not the property itself. They do so by bidding *down*. See *BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 752–53 (7th Cir. 2011). Bids are expressed not as a total price for the property but rather as decreasing interest percentages. *Id.* These percentages are the penalty interest rates that the buyer may demand from the delinquent taxpayer (or mortgage lender) to redeem the property. *Id.* In Illinois, the bids therefore work *down* from a statutory ceiling of eighteen percent. Zero percent is the floor. 35 Ill. Comp. Stat. 200/21–215 (2015).

Under this system, the *lowest* bidder wins and is granted the lien and a certificate of purchase.... And if the delinquent taxpayer and any mortgage lenders fail to redeem in the subsequent two years, the buyer takes the property free and clear.

*In re Smith*, 811 F.3d at 237–38 (emphasis in original). Because this system "is not designed to produce bids that could fairly be called 'reasonably equivalent value,' ... there is no correlation between the sale price and the value of the property." *Id.*, at 238 (internal quotation omitted). Accordingly, the *Smith* court reversed the decision of the district court that had reversed the bankruptcy court's judgment in favor of the debtors, to hold that *BFP*'s "conclusiveness" rationale could not apply to Illinois's tax sale certificate foreclosure process. *Id.*, at 247.

New Jersey also employs this interest rate method. *See* N.J.S.A. Title 54. Additionally, as happened here, if "there are no bids on a lien, the municipality automatically acquires it." New Jersey Foreclosure Law & Practice 18–2; *see* N.J.S.A. 54:5–34. The owner of the property may redeem the tax sale certificate by paying the redemption amount as calculated by the tax collector. N.J.S.A. § 54:5–54; *see* N.J.S.A. §§ 54:5–58, 54:5–59. A purchaser of a tax sale certificate may institute an action to foreclose the right of redemption after two years from the date of sale of the certificate, while the municipality need only wait six months. N.J.S.A. §§ 54:5–86(a), 54:5–114.4. The property owner has three months from the foreclosure to reopen the judgment, but "only upon the grounds of lack of jurisdiction or fraud in the conduct of the suit." N.J.S.A. § 54:5–87.

With this tax sale certificate system in place in New Jersey, two New Jersey bankruptcy courts previously determined that *BFP*'s reasoning did not apply to mandate that the price paid at the certificate sale is conclusively reasonably equivalent value, and I agree. *See Matter of Varquez*, 502 B.R. 186 (Bankr. D.N.J. 2013); *Berley Associates, Ltd. v. Eckert (In re Berley Associates, Ltd.)*, 492 B.R. 433 (Bankr. D.N.J. 2013). *BFP*'s analysis hinging on property being sold at mortgage foreclosure being "worth less" just does not apply to the foreclosure of redemption because the value is exchanged at least two years (or six months) earlier, at the time of the tax certificate sale. "[A]t the point of the entry of a judgment of foreclosure, there is no sale, forced or otherwise." *Varquez*, 502 B.R. at 192. *See In re Wentworth*, 221 B.R. 316, 320 (Bankr. D. Conn. 1998) ("While the forced sale price may be legitimate evidence of the property's value, the amount of a tax lien is *no* evidence whatsoever of the property's value."). Moreover, while investors may be hoping for a windfall in addition to

the interest earned on the certificate, "[t]here is no correlation between the sale price and the value of the property." *Berley*, 492 B.R. at 439.[9]

I am persuaded by and adopt the reasoning of both courts in *Varquez* and *Berley*. For the reasons stated in those cases, there simply is no correlation between the value received at the foreclosure of the equity of redemption and the value of the related property. Even if the court focused on the sale of the tax certificate as the relevant transfer, it would agree with *Berley* that "the absence of competitive bidding, together with appropriate advertising, [is] a significant bar to adjudicating 'reasonably equivalent value' in a tax sale foreclosure scenario." 492 B.R. at 440. Here, where there were not even any interested bidders and therefore the City acquired the tax sale certificate without any bidding, the conclusion would be even more evident. *BFP* does not compel the conclusion that the value transferred by foreclosure of the equity of redemption is conclusively reasonably equivalent value. What is more, there is no distinction between a third party purchaser as in the *Varquez* and *Berley* cases and a municipality, which was the purchaser in the case here.

The City cites various cases to support its position that do not change this court's position as they do not involve the interest rate method employed in New Jersey. *See T.F. Stone Co. v. Harper (In re T.F. Stone Co.)*, 72 F.3d 466 (5th Cir. 1995) (using the overbid method); *Russell–Polk v. Bradley*

*(In re Russell–Polk)*, 200 B.R. 218, 222 (Bankr. E.D. Mo. 1996) ("delinquent taxes, interest and charges provide a floor price or starting point for the sale ... and presumably, prospective purchasers may bid far in excess of the presumed fair market value of any tract."); *Golden v. Mercer County Tax Claim Bureau (In re Golden)*, 190 B.R. 52, 58 (Bankr. W.D. Pa. 1995) (properties sold at auction to highest bidder).

The City also cites *Vermillion v. Scarborough (In re Vermillion)*, 176 B.R. 563 (Bankr. D. Or. 1994), concerning default under land sale contracts, not tax foreclosure. Presumably the City cited it because the court applied *BFP* to its forfeiture procedure, as similar to New Jersey's tax sale procedure. However, this court agrees with *In re Grady*, 202 B.R. 120 (Bankr. N.D. Iowa 1996), which disputed *Vermillion's* conclusion, stating "When applied to a contract forfeiture where no sale occurs, the only barometer to determine value is the amount of any debt remaining on the sale contract. This amount has no relationship to market forces." *Id.*, at 125. Forfeitures simply cannot conclusively represent reasonably equivalent value.

The City argues that *Berley* and *Varquez* need to be distinguished from this case because here New Jersey's In Rem Tax Foreclosure Act (1948), N.J.S.A. 54:5—104.29 *et seq.* ("In Rem Law"), applies since the City, and not a third party, purchased the tax sale certificate and *in rem* relief is involved. As *Berley* and *Varquez* instead involved a third party pur-

---

**9.** The website, REtipster, explains the differences well:

> A lot of properties can be bought for **ridiculously low prices** at a tax sale. Why? *Because you're not dealing with a normal property owner who cares about getting full market value,* **you're dealing with the local government.** Contrary to popular belief, it's not the government's goal to get rich off

> every property they sell. They just want to get these properties **off their books** and in return, *they want the money they were owed in the first place* (with the hope that these properties will end up in the hands of someone who will keep the property taxes paid current).

http://retipster.com/tax-liens-tax-deeds/ (accessed May 10, 2017).

chaser of a tax sale certificate, those decisions have no application to this case since they provide analysis under New Jersey's Tax Sale Law, N.J.S.A.. 54:5–1 *et seq.* ("Tax Sale Law"), in which *in personam* relief is involved.

■ The court finds this argument is misplaced. First, the In Rem Law and the Tax Sale Law are virtually identical in purpose, scope, procedure and remedy. The principal purpose of the In Rem Law is to provide a method for collection of taxes. *Twp. of Jefferson v. Block 447A, Lot 10*, 228 N.J.Super. 1, 6, 548 A.2d 521 (App. Div. 1988); *Berkeley Tp. v. Berkeley Shore Water Co.*, 213 N.J.Super. 524, 532, 517 A.2d 1199 (App. Div. 1986); *Borough of New Shrewsbury v. Block 105, Lot 11, Assessed to Columbus Spellman Estate*, 104 N.J.Super. 360, 363, 250 A.2d 53, 55 (Ch. Div. 1969), *aff'd sub nom. Borough of New Shrewsbury v. Block 105, Lot 11*, 111 N.J.Super. 550, 270 A.2d 46 (App. Div. 1970). Likewise, the principal purpose of the Tax Sale Law is to provide a method for collection of taxes. *Princeton Office Park, LP v. Plymouth Park Tax Servs., LLC*, 218 N.J. 52, 61–66, 93 A.3d 332 (2014); *Simon v. Cronecker*, 189 N.J. 304, 315, 915 A.2d 489 (2007); *Simon v. Rando*, 374 N.J.Super. 147, 152, 863 A.2d 1078 (App. Div. 2005), *aff'd and remanded*, 189 N.J. 339, 915 A.2d 509 (2007). The In Rem Law is a remedial statute to be liberally construed. N.J.S.A. 54:5–104.31. *See also Borough of New Shrewsbury*, 104 N.J.Super. at 366, 250 A.2d 53. Similarly, the Tax Sale Law is a remedial statute to be liberally construed. N.J.S.A. § 54:5–3; *Princeton Office Park*, 218 N.J. at 65, 93 A.3d 332. Under both laws, a municipality may institute an action to foreclose the right of redemption any time after six months from the date of the tax sale. N.J.S.A. §§ 54:5–86, 54:5–104.34. Finally, under both laws, the relief is identical: the effect of the judgment is to "to bar the right of redemption, and to foreclose all prior or subsequent alienations and descents of the lands and encumbrances thereon, . . . and to adjudge an absolute and indefeasible estate of inheritance in fee simple, . . . to be vested in the plaintiff [/purchaser]". N.J.S.A. §§ 54:5–87, 54:5–104.64. The only true distinction between the laws is that a municipality may exercise its rights earlier than a third party. The laws have the same purpose and achieve the same goal—tax collection. It makes no sense to ignore the reasoning of *Berley* and *Varquez* simply because a municipality, rather than a third party, is involved. As such, the court finds that there is no significant difference prohibiting the application of the *Berley* and *Varquez* decisions.

Second, the "in rem" distinction is of no import. The court in *In re Canandaigua Land Dev., LLC v. County of Ontario (In re Canandaigua Land Dev., LLC)*, 521 B.R. 457, 476 (Bankr. W.D.N.Y. 2014), citing *Berley* and *Varquez*, refused to extend *BFP* to *in rem* strict tax foreclosures where there is no competitive bidding. Likewise, in *City of Milwaukee v. Gillespie*, 487 B.R. 916 (E.D. Wis. 2013) the court held that the city's *in rem* tax foreclosure procedure, which did not include a competitive sale process, was not sufficient to establish reasonably equivalent value. *See also In re Herkimer Forest Prod. Corp.*, No. 04-13978, 2005 WL 6237559, at *3 (Bankr. N.D.N.Y. July 26, 2005) (finding there was not a presumption of reasonable equivalent value in an *in rem* state tax foreclosure sale); *In re Lieberman*, No. ADV 11-02082-PRW, 2014 WL 6886267, at *2 (Bankr. W.D.N.Y. Dec. 4, 2014) (same). Hence, the court finds that the reasoning in *Berley* and *Varquez* applies equally to *in rem* foreclosures as it does to *in personam* foreclosures.

Nevertheless, the City argues that focusing on whether there is competitive bidding is misplaced, quoting *Talbot v. Federal Home Loan Mortgage Corp. (In re Talbot)*:

> The debtors' emphasis on the role of the competitive bidding process is not persuasive. The Supreme Court's decision in *BFP* was not predicated on a theory that a competitive bidding process provides the most accurate indication of the market forces that define a property's value. Rather, the Court held that the states, not the market, were entitled to define the "value" of property in the mortgage foreclosure context.

254 B.R. 63, 69 (Bankr. D. Conn. 2000). *But see Chorches v. Fleet Mortg. Corp. (In re Fitzgerald)*, 255 B.R. 807, 814 (Bankr. D. Conn. 2000) (disagreeing with *Talbot's* application of *BFP's* conclusive presumption of reasonably equivalent value).

Neither party cited, nor the could the court find, any portion of the Tax Sale Law or the In Rem Law that defines "value" in the foreclosure context. Rather, as set forth above, it is clear that the sole aim of the law is to simply enhance the tax-collecting ability of municipalities and provide marketable titles, not define value. N.J.S.A. § 54:5–85. *See Simon v. Cronecker*, 189 N.J. at 315, 915 A.2d 489; *Simon v. Rando*, 374 N.J.Super. at 152, 863 A.2d 1078. The court in *Princeton Office Park* notes:

> The Tax Sale Law serves "as a framework to facilitate the collection of property taxes." *Varsolona v. Breen Capital Servs. Corp.*, 180 N.J. 605, 620, 853 A.2d 865 (2004) (citing *Dvorkin v. Twp. of Dover*, 29 N.J. 303, 309, 148 A.2d 793 (1959)). It confers on a municipality that is owed real estate taxes " 'a continuous lien on the land' for the delinquent amount as well as for 'all subsequent taxes, interest, penalties and costs of collection.' " *Simon v. Cronecker*, 189 N.J. 304, 318, 915 A.2d 489 (2007) (quoting N.J.S.A. 54:5–6). "The Tax Sale Law converts that lien into a stream of revenue by encouraging the purchase of tax certificates on tax-dormant properties." *Ibid.* By authorizing the sale of liens in a commercial market, the Tax Sale Law gives rise to "a municipal financing option that provides a mechanism to transform a non-performing asset into cash without raising taxes." *Varsolona, supra*, 180 N.J. at 610, 853 A.2d 865.

*Princeton Office Park*, 218 N.J. at 61–62, 93 A.3d 332. The court further noted:

> The statute is a "remedial statute ... [to be] liberally construed to effectuate the remedial objects thereof." N.J.S.A. 54:5–3. The legislative purpose is to "aid municipalities in raising revenue," by attracting "third parties to the opportunity to acquire ... property." *Bron v. Weintraub*, 42 N.J. 87, 91–92, 199 A.2d 625 (1964); *see also In re Curry*, 493 B.R. 447, 451 (Bankr. D.N.J. 2013) (stating that certain "provisions of the Tax Sale Law make it evident that the process created by the statute has but one goal—the collection of taxes"); *Lonsk v. Pennefather*, 168 N.J.Super. 178, 182, 402 A.2d 259 (App. Div. 1979) (noting that "the public policy in this State is to encourage tax sale foreclosure so as to assist municipalities in the collection of delinquent taxes"). In short, "[t]he purpose of the Tax Sale Law is to enhance the collection of taxes." *Simon v. Rando*, 374 N.J.Super. 147, 152, 863 A.2d 1078 (App. Div. 2005), *aff'd*, 189 N.J. 339, 344–45, 915 A.2d 509 (2007); *see Varsolona, supra*, 180 N.J. at 617–18, 853 A.2d 865; *In re Kopec*, 473 B.R. 597, 600–01 (Bankr. D.N.J. 2012).

*Princeton Office Park*, 218 N.J. at 65–66, 93 A.3d 332. In the end, the Tax Sale Law and the In Rem Law provide municipali-

ties with a mechanism to recover unpaid taxes plus interest and the costs of the sale. It is a recovery mechanism—nothing more. It does not in any way, provide a valuation mechanism. And, when a municipality holds the tax sale certificate, the tax amount cannot be conclusive of reasonably equivalent value because the amount is only for the delinquent amount and related charges.

As further explained by the court in *Varquez*, 502 B.R. 186:

In the context of New Jersey tax sale certificate foreclosures, the sale aspect of the transaction occurs at least two years before the transfer of title to the property, when the municipality that is owed a tax by the debtor sells its lien against the debtor's property to a successful bidder. The auction process for the purchase of a tax sale certificate has similar noticing requirements to mortgage foreclosure sales, *see* N.J.S.A. § 54:5–26, but the process *does not relate to the value of the property*. The amount bid on by prospective purchasers of the tax sale certificate is the same for all purchasers. It is the amount of the outstanding charges owed to the municipality. N.J.S.A. § 54:5–25 and 5–31. The successful purchaser is the purchaser who bids for the property "subject to redemption at the lowest rate of interest, but in no case in excess of 18% per annum." N.J.S.A. § 54:5–32. In other words, the bidders are only bidding on the interest rate to be paid to them by the debtor in the event that the debtor redeems the certificate. If the two year redemption period expires without redemption by the debtor, and the successful purchaser achieves a judgment of foreclosure, fee simple title to the property vests in the purchaser. The purchaser will have paid the amount of the outstanding municipal charges due on the property. *The "value" received by the debtor, i.e., the satisfaction of the outstanding tax debt due to the tax sale certificate holder, has no relation to the value of the property being transferred.* The concept of "reasonably equivalent value" cannot rest on the amount of tax debt paid by the purchaser two years prior to the transfer of title.

*Id.* at 193 (emphasis added) (footnote omitted). In the case of a municipality obtaining a tax sale certificate, reasonably equivalent value, probably more so since there is no competitive bidding, cannot rest on the amount of tax debt because that amount bears no relation to the value of the property. As a result, the court's focus on competitive bidding is not misplaced.

In light of the foregoing, the court finds that *BFP* and the other cases and statutes cited by the City do not bar recovery by GGI under 11 U.S.C. § 548(a)(1)(B), in that the amount received at the tax sale certificate foreclosure does not necessarily reflect a reasonably equivalent value for the Property.

## 2. Policy considerations

The City urges this court to disagree with *Smith*, 811 F.3d 228 (6th Cir. 2016), because otherwise "courts are putting aside the question of stability in the tax foreclosure process and the deference that courts should give to state court procedures and policies with respect to property rights." Doc. 18–9, p. 10. The City also argues that allowing the transfer to be set aside would impinge on state court rights. Doc. 18–9, p. 22. This court disagrees. There would be no impingement on the foreclosure process or state court rights.

This court acknowledges that *BFP* raises concerns about the avoidance of foreclosure sales in bankruptcy matters and directs that a "federal statutory purpose" to "displace traditional state regulation" must

be "clear and manifest." *BFP*, at 544–45, 114 S.Ct. 1757. But the *BFP* majority solved that problem by defining "reasonably equivalent value" to be the amount obtained at the foreclosure sale held pursuant to the state's mortgage foreclosure procedures, requiring *inter alia*, notice and an opportunity for competitive bidding. Moreover, the Supreme Court "expressly left open the prospect that transfers occurring in the context of 'tax sale' may be avoidable under § 548." *Varquez*, 502 B.R. at 196. As set forth above, New Jersey's tax foreclosure procedures are not formulated to result in reasonably equivalent value, particularly when there are no bidders and the municipality purchases the tax lien.

This court also acknowledges that New Jersey statutes provide that neither a judgment to foreclose the right of redemption nor the recording thereof "shall be construed to be a sale, transfer, or conveyance of title or interest to the subject property under the provisions of the 'Uniform Fraudulent Transfer Act, R.S. 25:2–20 et seq.'" N.J.S.A. §§ 54:5–87, 54:5–104.32 ("UFTA"). *See, e.g., In re 2435 Plainfield Ave., Inc.*, 72 F.Supp.2d 482, 483 (D.N.J. 1999), *aff'd*, 213 F.3d 629 (3d Cir. 2000). The court agrees that GGI would be prevented from setting aside the transfer under UFTA. But here, GGI is seeking relief under section 548 (and, as set forth below, under section 547) of the Bankruptcy Code, not UFTA. The Bankruptcy Code does not restrict recovery or prohibit the relief requested as does the state court statute. UFTA is not relevant and there is no interference with the state court statutes.[10]

To this end, this court again agrees with and incorporates the *Berley* decision. In recognizing the restriction on setting aside foreclosure judgments under UFTA, that court acknowledged that:

It comes as no surprise that New Jersey legislators desired to protect municipalities (often the sole purchasers of the tax sale certificates) by shielding tax foreclosures from collateral attack as fraudulent transfers. This Court, however, is charged with the responsibility to construe the language of the Bankruptcy Code in a manner to ensure equitable and fair treatment to *all* similarly situated creditors. *See, e.g., Balaber–Strauss v. Town of Harrison (In re Murphy)*, 331 B.R. 107, 120 (Bankr. S.D.N.Y. 2005) ("Certainly, New York State has a strong interest in assuring that its citizens meet their tax obligations and to enforce those obligations when they remain unmet. However, that interest cannot overcome Congress' policy choice that reasonably equivalent value must be obtained for a transfer of a debtor's property in the bankruptcy context, where the rights of other creditors are prejudiced.").... Moreover, by requiring the parties to establish equivalent value, this Court is neither nullifying nor undercutting the New Jersey tax sale law. *See In re Williams*, 473 B.R. 307, 320 (Bankr.E.D.Wis.2012), *aff'd in part, City of Milwaukee v. Gillespie, supra*, 487 B.R. 916 (E.D.Wis.2013) ("By ruling that a 'strict foreclosure' pursuant to Wis. Stat. § 75.521 constitutes a fraudulent transfer, the Court is not invalidating Wis. Stat. § 75.521. It is holding that, in the context of a bankruptcy proceeding, such a transfer is subject to a

---

10. Indeed one might interpret the state statute as presenting an obstacle to the objectives of Congress in enacting §§ 547 and 548 of the Bankruptcy Code thereby allowing preemp-

tion of the state statute. See *Matter of Princeton–N.Y. Inv'rs, Inc.*, 199 B.R. 285, 297 (Bankr. D.N.J. 1996), *aff'd*, 219 B.R. 55 (D.N.J. 1998).

§ 548 'reasonably equivalent value' analysis.").

Furthermore, the Court is not persuaded by [Defendant's] argument that avoidance of the transfer will chill the sale of tax sale certificates by clouding title to acquired properties. This need not be the result as the Court has ample discretion to fashion appropriate relief. *Berley*, 492 B.R. at 441–42.

No rights are impinged because a municipality remains protected. "Congress carefully considered the effect of the new Bankruptcy Code on tax collection ... and decided to provide protection to tax collectors, ... through grants of enhanced priorities for unsecured tax claims ... and by the nondischarge of tax liabilities." *United States v. Whiting Pools, Inc.*, 462 U.S. 198, 209, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983). Also, the Bankruptcy Code gives a municipality its secured claim back. 11 U.S.C. § 502(h); *see Rushton v. Bank of Utah (In re C.W. Mining Co.)*, 477 B.R. 176, 186 (10th Cir. BAP 2012) ("By virtue of the plain language of § 502(h), the status of a secured or unsecured claim arising thereunder is determined by its status *as if the claim had arisen the date before the petition is filed.*) (footnotes omitted, emphasis in original), *aff'd*, 749 F.3d 895 (10th Cir. 2014); *Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 68 (1st Cir. 2004) ("It is Fleet's status as a secured creditor at that time, not later, that determines the nature of its present 502(h) claim."). The debtor must immediately provide adequate protection. 11 U.S.C. § 363(e). If the municipality made improvements to the property, the Code protects it with a credit. 11 U.S.C. § 550(e); *Smith*, at 239–40. The debtor also must pay the postpetition taxes, which enjoy priority. 11 U.S.C. §§ 503(b)(1)(B), 507(a)(8). If it cannot comply with all of these conditions, it faces conversion or dismissal. *See* 11 U.S.C. §§ 1112(b)(4)(I), 1123(a)(5)(G), 1129(b)(2)(A). If converted, a chapter 7 trustee takes over; if dismissed, the transfer is reinstated and the property revests with the municipality. 11 U.S.C. § 349(b). Thus, at worst, a municipality faces delays. But during the bankruptcy case its interests are protected.

Moreover, New Jersey municipalities are protected by the Code's "reasonably equivalent value" standard. Here, if the Property is as worthless as the City claims, then the transfer will not be avoided and the City will not have been harmed. If the property is worth $690,000 and not avoided, the City would realize a windfall. That equity should inure instead to the benefit of a debtor's unsecured creditors to assist in giving the debtor a fresh start. *Smith*, at 238, 239. As stated in *I.E.'s, LLC v. Simmons*:

> Of course, the legislature's concern in fostering payment of property taxes and in barring the right of redemption to permit transfer of clear title to property involved in tax sale certificate foreclosures is legitimate. The system is equitable where property is abandoned or where the liens against it exceed its value. Nevertheless, in circumstances where the owners hold substantial equity in the property, the system can be Dickensonian. Until the Legislature devises a better system, courts of equity must do their best to balance the equities, taking into account the necessity of allowing the transfer of clear title and the need to compel the payment of property taxes against the necessity of ameliorating, in appropriate circumstances, the onerous impact of the procedure in circumstances where the party has remained in possession of the property and has substantial equity in it.

392 N.J.Super. 520, 537, 921 A.2d 483 (Law. Div. 2006).

The Code's two year statute of limitations applicable to section 548 (and 90–day lookback for preferences) also lessens a municipality's risk of an avoidance of its foreclosure action. As explained in *In re Williams*:

> 48. [H]olding that ... the transfers violated § 548(a)(1)(B) does not mean that *every* tax-lien foreclosure transfer, even if conducted via the "strict foreclosure" process, will constitute a fraudulent conveyance. Transfers that do not occur within the two-year period prior to the bankruptcy petition date are not fraudulent transfers. True, the taxing authority has no idea, when it makes the transfer, whether the homeowner eventually will file for bankruptcy relief, or when. It must assume that some homeowners may so file. But it is highly unlikely that everyone whose home is foreclosed due to tax liens will stampede the bankruptcy court just to avoid the transfer—bankruptcy is a long, intrusive and expensive process, and the consequences for abusing the system when one is not eligible for relief are serious ones.
>
> 49. Similarly, if the homeowner was not insolvent at the time of the transfer, or was not rendered insolvent by the transfer, there is no fraudulent transfer.

473 B.R. 307, 320–21 (Bankr. E.D. Wis. 2012), *aff'd in part, vacated in part on other grounds sub nom. City of Milwaukee v. Gillespie*, 487 B.R. 916 (E.D. Wis. 2013).

Bankruptcy courts can also contribute to finality by ordering a return of the value of the property rather than the property itself. 11 U.S.C. § 550(a). *See Berley*, at 442. That result prevents the transfer back and forth of the property until its value is reasonably equivalent to the amount of taxes due. Ordering the value returned allows the municipality to return the property to its tax rolls, which is what the City here states is its goal. *See* Doc. No. 18–9, p. 16 ("resolve an eyesore"); p. 21 ("realize on its taxes and attempt to put a property back on the tax roles [sic] for the benefit of its citizens.").

A municipality's goal is not supposed to be to get rich off of tax foreclosures. Its goal is securing payment of outstanding tax obligations. Our bankruptcy system attempts to ensure fair treatment of all creditors; municipalities similarly seek to ensure equitable payment of taxes across its constituents. While the Bankruptcy Code may interrupt a municipality's pursuit of that goal, it does not prevent it, and the City's policy considerations are inadequate to overcome GGI's right to pursue a claim under §§ 547 and 548.

### 3. Reasonably equivalent value test

■ The parties both argued that if this court ruled out *BFP's* approach, then it should look to pre-*BFP* Third Circuit precedent, i.e, *Barrett v. Commonwealth Federal Sav. and Loan Ass'n*, 939 F.2d 20 (3rd Cir. 1991), to determine reasonably equivalent value. Though they characterize that case as supporting a "totality of the circumstances" test, they both nevertheless focus on a "70 percent rule." *See Barrett*, at 23 (discussing *Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203–04 (5th Cir. 1980); *Bundles v. Baker*, 856 F.2d 815 (7th Cir. 1988)). They possibly do this because that test provides a neat rule of thumb. But *Barrett* and the cases it relied on concerned mortgage, not tax, foreclosure. Moreover, *BFP* referred to the 70 percent rule as an "artificially constructed criterion." *BFP*, at 540, 114 S.Ct. 1757. Indeed, the *Durrett* court came up with 70 percent because it was "unable to locate a decision of any district or appellate court dealing only with a transfer of real property as the subject of attack under section 67(d) of the Act, [that] approved the transfer for less than 70 percent of the market

value of the property." *Durrett v. Washington Nat. Ins. Co.*, 621 F.2d at 203. This court found no post-*BFP* cases in the Third Circuit applying the 70 percent rule. *See Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002) ("courts have rejected the application of any fixed mathematical formula to determine reasonable equivalence"), *aff'd sub nom. In re USN Commc'ns, Inc.*, 60 Fed.Appx. 401 (3d Cir. 2003)

 This court instead is guided by more recent Third Circuit precedent.[11]

Before considering a plaintiff's obligation to define with precision the value surrendered and gained as a result of a transfer, we need to understand the general structure of the reasonably equivalent value analysis. We have interpreted "value" to include "any benefit[,] ... whether direct or indirect." *[In re] R.M.L. [Inc.]*, 92 F.3d [139,] 150 [ (3d Cir. 1996) ]....

If a court determines that the debtor gained at least some value as a result of the transfer, what follows is a comparison: whether the debtor got roughly the value it gave. *See* 11 U.S.C. § 548(a)(1)(A); *Metro Commc'ns*, 945 F.2d [635,] 647 [3d Cir. 1991]. In conducting this factual analysis, a court does look to the "totality of the circumstances," including (1) the "fair market value" of the benefit received as a result of the transfer, (2) "the existence of an arm's-length relationship between the debtor and the transferee," and (3) the transferee's good faith. *R.M.L.*, 92 F.3d at 148–49, 153.

*Pension Transfer Corp. v. Beneficiaries under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003 (In re Fruehauf Trailer Corp.)*, 444 F.3d 203, 212–13 (3d Cir. 2006). *See In re Nat'l Pool Const., Inc.*, 09–34394 KCF, 2013 WL 6909918, at \*5 (D.N.J. Dec. 31, 2013) (same), *aff'd sub nom. Pyfer v. Am. Mgmt. Servs. (In re Nat. Pool Constr., Inc.)*, 598 Fed.Appx. 841 (3d Cir. 2015). *See also BFP*, at 545, 114 S.Ct. 1757 (1994) ("the "reasonably equivalent value" criterion will continue to have independent meaning (ordinarily a meaning similar to fair market value) outside the foreclosure context.").

 Thus this court is to employ a two-step inquiry. *Goodman v. H.I.G. Capital, LLC (In re Gulf Fleet Holdings, Inc.)*, 491 B.R. 747, 770 (Bankr. W.D. La. 2013). The transaction is reviewed at the time the transfer was made. *In re R.M.L., Inc.*, 92 F.3d at 153; *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 466 (4th Cir. 1990). "Courts will not factor in post-transfer appreciation or depreciation." *Collier on Bankruptcy*, ¶ 548.05[2][a]. "The purpose of the laws is estate preservation; thus, the question whether the debtor *received* reasonable value must be determined from the standpoint of the creditors." *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 646 (3d Cir. 1991), *as amended* (Oct. 28, 1991) (emphasis in original).

Here, neither party disputes that GGI received value in having its tax debt of $429,767.45 extinguished. Thus the first step is met. Next, as concerning an involuntary transfer, I can find that the relationship between GGI and the City was at arm's-length. *See Cassidy v. Advance Imaging Ctr. of N. Ill. LP (In re Cassidy)*, 352 B.R. 511, 516 (Bankr. M.D. Fla. 2006).

11. Neither the *Varquez* or *Berley* decisions addressed the standard for determining reasonably equivalent value because, in *Varquez*, fraudulent transfer had been raised as a defense to a motion for relief from stay, thus the court awaited the filing of an adversary proceeding by the debtor, and in *Berley*, the court denied summary judgment with value to be determined at trial. Both cases settled prior to trial.

This leaves the fair market value and the City's good faith. While the City asserts that the value is nominal, GGI asks this court to find more probative a value attained March 17, 2016, three and a half months after the transfer, under a contract entered into postpetition when it did not own the Property, with a buyer who already had a contract to purchase for $160,000 less. Thus the court considers the value contested. GGI, as the plaintiff, will bear the burden of proof at trial by a preponderance of the evidence on both these issues. *In re Fruehauf Trailer Corp.*, at 211.

In determining the value of the Property, the court will be mindful that [t]he test used to determine reasonably equivalent value in the context of a fraudulent conveyance requires the court to determine the value of what was transferred and to compare it to what was received." *Barber v. Golden Seed Co., Inc.*, 129 F.3d 382, 387 (7th Cir. 1997). The term "fair market value" refers to "the amount at which the property would change hands between a willing buyer and a willing seller, when the former is not under compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of the relevant facts." Jay E. Fishman et al., *PPC's Guide to Business Valuations* ¶ 201.4 (15th ed. 2005) (quoting Internal Revenue Service Ruling 59–60).

*In re Greater Se. Cmty. Hosp. Corp. I*, 02–02250, 2008 WL 2037592, at *8 (Bankr. D.D.C. May 12, 2008). As explained by *In re Early*, 05–01354, 2008 WL 2073917 (Bankr. D.D.C. May 12, 2008), *order amended and supplemented*, 05–01354, 2008 WL 2569408 (Bankr. D.D.C. June 23, 2008), in the context of section 550(a):

[D]etermining the market value of transferred property is simplified if that property was transferred by way of a sale, because what a willing buyer will pay a willing seller is the absolute best indication of fair market value. If the property was not transferred pursuant to a sale, however, other circumstances surrounding the transfer of the property may provide insight into the fair market value of the property . . . .

*Id.*, at *9 (internal quotations, citations and footnote omitted).

An appraisal of course attempts to estimate what this amount might be. In valuing property for tax assessment purposes, one court explained "There are three basic approaches commonly used to value real estate: the cost approach, the sales comparison (or market data) approach, and the income capitalization approach, or any combination of these three." *In re Mocco*, 222 B.R. 440, 457 (Bankr. D.N.J. 1998) (citing *The Appraisal of Real Estate*, American Institute of Real Estate Appraisers, 9th ed. (1987)). When using the sales comparison approach, one must identify the property's highest and best use. *Id. See, e.g., In re Webb Mtn, LLC*, 420 B.R. 418, 428 (Bankr. E.D. Tenn. 2009), *aff'd*, 3:09–CV–559, 2010 WL 1544092 (E.D. Tenn. Apr. 19, 2010) (finding a valuation that was the fair market value of willing buyers, including considering the property's highest and best use at the time of the assessment and comparable sales). "Under New Jersey law, 'highest and best use' is defined as 'the reasonably probable and legal use of an improved property which is physically possible, appropriately supported, financially feasible and that which results in the highest value, i.e. most profitable.'" *Mocco*, at 458 (quoting *Schimpf v. Little Egg Harbor Tp.*, 14 N.J.Tax 338, 343–44 (1994), which was citing American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* at 212, 294 (10th ed. 1992)). Here, the City's

appraiser considered the highest and best use to be to tear down the existing buildings, and that is also what GGI contends its purchaser intends to do in part.

Though an actual price paid may be the best evidence, *In re Webb Mtn, LLC*, 420 B.R. 418, 443–44 (Bankr. E.D. Tenn. 2009), *aff'd*, 3:09–CV–559, 2010 WL 1544092 (E.D. Tenn. Apr. 19, 2010), *In re WRT Energy Corp.*, 282 B.R. 343, 373 (Bankr. W.D. La. 2001) (footnote omitted) (giving more weight to actual sale price than to appraisal), we do not have an actual sale here, only sale contracts. *See In re Whitney*, 06–14435–TJC, 2007 WL 2230063, at *7 (Bankr. D. Md. July 30, 2007) (amount paid by the defendant was simply the amount needed to reinstate the loan and to pay other expenses related to the loan or the Property); *In re Richardson*, 23 B.R. 434, 443 (Bankr. D. Utah 1982) (stating that "the price which the property would actually bring if presently offered for sale by the owner, with a reasonable time for negotiation, should be a helpful starting point in determining value for purposes of Section 548(a)(2).").

In determining "rough" equivalence, other courts' decisions in the tax foreclosure context are of little help, as the cases found had widely divergent figures to compare. *See, e.g., In re Canandaigua Land Dev., LLC*, 521 B.R. 457, 477 (Bankr. W.D.N.Y. 2014) (finding that property worth 18–25 times the outstanding taxes did not represent a transfer for reasonably equivalent value); *In re Williams*, 473 B.R. 307, 322 (Bankr. E.D. Wis. 2012) (properties worth 8–16 percent of city's assessed value not reasonably equivalent value), *aff'd in part, vacated in part sub nom. City of Milwaukee v. Gillespie*, 487 B.R. 916 (E.D. Wis. 2013); *Brown v. Phillips (In re Phillips)*, 379 B.R. 765, 782 (Bankr. N.D. Ill. 2007) (transfer of property valued at $1.1–1.3 million for less than $100 not reasonably equivalent value); *In re Wentworth*, 221 B.R. 316, 320 (Bankr. D. Conn. 1998) (holding that satisfaction of tax lien of $1,515 did not deliver reasonably equivalent value for transfer of property with a market value of $20,700). *But see 4100 W. Grand LLC v. TY Grand LLC (In re 4100 W. Grand LLC)*, 481 B.R. 444, 456 (Bankr. N.D. Ill. 2012) (holding that debtor did not receive less than reasonably equivalent value when it transferred deed-in-lieu to creditor where property was worth $1,115,000 and debtor received a release of over $2,000,000; but release of debtor's debt in the amount of $2,510,123 was reasonably equivalent to the $2,300,000 transferred to the creditor); *In re Harris*, 01–10365, 2003 WL 25795591, at *6 (Bankr. N.D.N.Y. Mar. 11, 2003) (reasonably equivalent value transferred where tax liens exceeded value of properties).

As for the City's good faith, GGI appears quite indignant that the City did not delay foreclosure to allow GGI to sell the property. It alleges the City proceeded because it has a "vendetta" against GGI tracing all the way back to the Delaware Bankruptcy causing it to not work with GGI to achieve a sale. However, GGI did not present any authority for the premise that the City had any obligation to wait for GGI to obtain a buyer. Where a couple complained that the IRS denied it an audit and legal representation because it denied them an extension of time to prepare for the audit, the Third Circuit stated that the taxpayers' "assertion that the IRS retaliated against them by refusing to settle is conclusory, and, in any event, the IRS had no duty to settle with them." *Robinson v. C.I.R.*, 487 Fed.Appx. 751, 753 (3d Cir. 2012). Certainly, GGI does not argue that municipalities do not have a duty to comply with statutes that direct them to collect taxes or that taxpayers do not have a duty to pay these taxes when assessed. *See*

*Read v. Bd. of Comm'rs of City of Newark,* 103 N.J.L. 60, 64, 134 A. 757 (1926). *See also In re Myers,* 491 F.3d 120, 129 (3d Cir. 2007) (affirming that bankruptcy court did not abuse its discretion in concluding that debtor's dilatory tactics and prejudice to the creditor outweighed the creditor's unclean hands in violating the stay). Moreover, four years passed between the tax certificate sale and the foreclosure of redemption.

 GGI has not paid taxes since 2009. It owes the City over $400,000. GGI is not currently generating any income from the Property. Prior contracts for sale fell through. The City maintains that it has a right to make sure that any buyer will be able to return the Property to a revenue-generating condition. Thus GGI raises the issue of the City's clean hands dangerously considering also that it has prevented the City from selling the Property during this proceeding by the filing of a *lis pendens,* not withdrawing it even when allowing that it would accept the value of the Property instead of the Property as its remedy. "The clean hands doctrine is applicable when 1) a party seeking affirmative relief 2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith 3) directly related to the matter in issue 4) that injures the other party 5) and affects the balance of equities between the litigants." *Castle v. Cohen,* 676 F.Supp. 620, 627 (E.D. Pa. 1987), *aff'd and remanded,* 840 F.2d 173 (3d Cir. 1988).

 That said, the court finds unpersuasive on this record the City's argument that GGI is precluded from re-litigating its bad faith claims. As the City points out, for a claim to be precluded under the doctrine of collateral estoppel, among other elements, the issue sought to be precluded must be the same as that involved in the prior action. However, GGI raised the bad faith as a defense to the foreclosure action. The state court did not find that the allegations were false, but that they were insufficient to rebut why GGI was unable to pay the taxes. Here, GGI presents the same alleged facts but to support one element of the reasonably equivalent value test, i.e., that the City has not acted in good faith.

Regardless, this court considers the good faith question to be another genuine issue of material fact. *See In re Fruehauf Trailer Corp.,* 444 F.3d at 216 (finding that a Key Employee Retention Program was a transfer not made in good faith where evidence supported that it was adopted by insiders who stood to greatly benefit from it); *In re Kendall,* 440 B.R. 526, 533 (8th Cir. BAP 2010) (finding that transfer was entered into in good faith where transferee disclosed the costs, requirements and risks of a debt settlement program); *In re 4100 W. Grand LLC,* 481 B.R. at 459 (note holder's knowledge of debtor's default did not support finding of lack of good faith); *In re Zambrano Corp.,* 478 B.R. 670, 696 (Bankr. W.D. Pa. 2012) (transferee's good faith in question due to his failure to return the money as agreed to upon the partnership's first distribution); *In re TC Liquidations LLC,* 463 B.R. 257, 269 (Bankr. E.D.N.Y. 2011) (trustee failed to establish that the salary increases were excessive or in bad faith); *In re. Fedders N. Am., Inc.,* 405 B.R. 527, 547 (Bankr. D. Del. 2009) (finding that complaint stated a constructive fraud claim where it alleged, *inter alia,* that transfer was made for the benefit of an insider under an employment contact and not in the ordinary course of business).

The City argues that the court in comparing the amount of the transfer to what the GGI received "should take into consideration the amount of taxes that will be owed if the sale is set aside." Doc. No. 18–9, p. 14. It alleges that as of March 1, 2017,

the taxes totaled $514,875.24. But the court is bound to compare the value that GGI received as a consequence of the transfer, which must be the amount of the taxes on the date of the transfer. 11 U.S.C. § 548(a)(1)(B)(i).

As a trial must be held to determine these fact issues, summary judgment must be denied as to the First Count.

### B. Count Two—Avoidance of preferential transfer

GGI also seeks to avoid the transfer as a preference pursuant to section 547, which provides:

(b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b) (2017). The debtor is presumed to be insolvent on and during the 90 days prepetition. 11 U.S.C. § 547(f). *See In re Trappers Creek, LLC*, ADV. 09–8067, 2010 WL 797022, at *4 (Bankr. C.D. Ill. Mar. 5, 2010) (creditor's burden to rebut insolvency presumption). The plaintiff has the burden of proving the avoidability of a transfer, while the defendant has the burden of proving any defenses to avoidance. 11 U.S.C. § 547(g).

GGI alleges that there was a transfer of the Property, for the benefit of a creditor, on account of an antecedent debt owed by the debtor before the transfer was made, while the debtor was insolvent, within 90 days of the bankruptcy filing. The City only concedes that final judgment in foreclosure was entered within 90 days of the date of the filing of the petition. It then argues that a transfer to a secured creditor is not avoidable as a preference, though if it is oversecured, then the issue turns on the value of the Property.

The City cites *In re FIBSA Forwarding, Inc.*, 244 B.R. 94 (S.D. Tex. 1999) for the proposition that the price received at foreclosure sale is reasonably equivalent value and that is what a creditor could expect in chapter 7. The *FIBSA* court extended *BFP* to preferences, stating that "If the price received at a foreclosure is reasonably equivalent to the value of the Property sold, then parity of reasoning would suggest that such a foreclosure sale would not have the effect of "enabl[ing] such creditor to receive more than such creditor would receive' in a chapter 7. 11 U.S.C. § 547(b)(5). In other words, the creditor received reasonably equivalent value at the foreclosure sale and that is what the creditor could expect in a Chapter 7." *In re FIBSA Forwarding, Inc.*, at 96. However, similarly, my determination that *BFP* does *not* apply to New Jersey's

tax foreclosure system for fraudulent transfers applies equally to preferences. *See also In re Rambo*, at 432 (refusing to apply *BFP* to avoidance of mortgage foreclosure as a preference). Thus this court will only look to whether there is no genuine issue of material fact whether the City received more by its foreclosure than it would have if this case were a case under chapter 7 and the transfer was not made, and that the City is entitled to judgment as a matter of law.

 Section 547(b)(5)'s requirement that the creditor not receive more [12] by a prepetition transfer than it would under chapter 7 "simply carries out 'the common sense notion that a creditor need not return a sum received from the debtor prior to bankruptcy if the creditor is no better off vis-a-vis the other creditors of the bankruptcy estate than he or she would have been had the creditor waited for liquidation and distribution of the assets of the estate.' " Collier on Bankruptcy, ¶ 547.03 (Matthew Bender 2017) (quoting *Hager v. Gibson (In re Hager)*, 109 F.3d 201, 210 (4th Cir. 1997)). Where a creditor is fully secured, there can be no preference.

A transfer is a preference only if it entitles the transferee to more than it would have received pursuant to a chapter 7 liquidation. 11 U.S.C. § 547(b)(5). Because a fully-secured creditor would be entitled to payment in full before other creditors in a chapter 7 liquidation, any payment to that secured party could not possibly be for more than it

would receive in a liquidation. *See Burtch v. Conn. Cmty. Bank, N.A. (In re J. Silver Clothing, Inc.)*, 453 B.R. 518, 533 (Bankr. D. Del. 2011) ("In a Chapter 7 liquidation, the [secured creditor] would receive priority over the unsecured creditors and therefore would receive payment in full.").

*EPLG I, LLC v. Citibank, N.A. (In re Qimonda Richmond, LLC)*, 467 B.R. 318, 323 (Bankr. D. Del. 2012). *See In re Rimmer Corp.*, 80 B.R. 337, 340 (Bankr. E.D. Pa. 1987) (same, also citing 11 U.S.C. § 506(a)). *See Schwinn Plan Comm. v. AFS Cycle & Co. (In re Schwinn Bicycle Co.)*, 182 B.R. 514, 522 (Bankr. N.D. Ill. 1995) (stating that secured claim "usually 'preferred' because secured creditors generally receive 100% of the value of their collateral upon distribution in a Chapter 7 case.") (citing, *inter alia*, 11 U.S.C. § 506); *Cain v. Mappa (In re Pineview Care Ctr., Inc.)*, 142 B.R. 677, 686 (Bankr. D.N.J. 1992) ("Since UJB/S was fully secured at the time of the payments, it received no more than it would have under Chapter 7 as a result of the payments."), *aff'd*, 152 B.R. 703 (D.N.J. 1993).

 However, this pertains to where a secured creditor releases its lien in the amount of the transferred property, not where the value of the property transferred is greater than the secured claim, as alleged here by GGI. *Berley*, 492 B.R. at 444 (following *Norwest Bank Minn., N.A. v. Andrews (In re Andrews)*, 262 B.R. 299, 306 (Bankr. M.D. Pa. 2001). A preference might be found "when the debt-

---

**12.** The *Berley* decision cites with approval the statement in *Norwest Bank Minn., N.A. v. Andrews (In re Andrews)*, 262 B.R. 299, 306 (Bankr. M.D. Pa. 2001), that "a prepetition bankruptcy foreclosure sale can be avoided under the dictates of 11 U.S.C. § 547 when the secured claim of the foreclosing party is *substantially less* than the fair market value of the property." *Berley*, at 444 (emphasis add-

ed). But section 547(b)(5) states only that the creditor not receive "more" under chapter 7. *See In re Rambo*, 297 B.R. 418, 431 (Bankr. E.D. Pa. 2003) ("The *Andrews* court did not explain its choice of the word "substantially" nor how that would square with the statutory language that only requires a creditor to receive "more" that it would otherwise be entitled to.").

or can show that the debtor has equity in the property such that the creditor was oversecured, and that the trustee would therefore have sold the property to benefit the debtor's unsecured creditors." *Rocco v. J.P. Morgan Chase Bank*, 255 Fed.Appx. 638, 642 (3d Cir. 2007).

■■■ In this situation, the time for determining whether there is equity is the petition date. *In re Trappers Creek, LLC*, ADV. 09–8067, 2010 WL 797022, at *3 (Bankr. C.D. Ill. Mar. 5, 2010) (stating that "a clear majority use the filing date as the proper time to determine a creditor-defendant's secured status). This determination stems from *Palmer Clay Products v. Brown*, 297 U.S. 227, 229, 56 S.Ct. 450, 80 L.Ed. 655 (1936):

Whether a creditor has received a preference is to be determined, not by what

the situation would have been if the debtor's assets had been liquidated and distributed among his creditors at the time the alleged preferential payment was made, but by the actual effect of the payment as determined when bankruptcy results.

*See Falcon Creditor Trust v. First Ins. Funding (In re Falcon Products, Inc.)*, 381 B.R. 543, 547 (8th Cir. BAP 2008) (citing *Palmer*); *Royal Golf Products Corp. v. Fidelity Bank of Michigan (In re Royal Golf Products Corp.)*, 908 F.2d 91, 95 (6th Cir. Mich. 1990) (citing *Palmer*); *Rambo v. Chase Manhattan Mortgage Corp. (In re Rambo)*, 297 B.R. 418, 431–32 (Bankr. E.D. Pa. 2003).[13] Though *Palmer* was a Supreme Court decision, it was decided under the 1898 Act and a differently-worded preference statute.[14] Yet section

---

**13.** *Rambo* also cited David Gray Carlson, *Security Interests in the Crucible of Voidable Preference Law*, 1995 U. Ill. L. Rev. 211, 265 (1995), as supporting its conclusion that value should be determined as of the petition date. That article reasoned:

The effect of this rule is that the secured party takes the consequences of appreciation or depreciation of collateral between the time of the challenged transfer and the time of the bankruptcy petition. For example, suppose the secured party was oversecured at the time additional collateral is transferred. Because of depreciation, the creditor is undersecured at the time of the bankruptcy petition. The secured party flunks the hypothetical liquidation test. This principle is tempered when the oversecured party is paid and later the collateral depreciates. The payment constitutes a simultaneous release of the collateral. Thus, although the payment itself is a transfer on antecedent debt, the secured party simultaneously gave back new value by the pro tanto release of the security interest. The secured party—oversecured at the time of payment and undersecured at the time of bankruptcy—will be eligible for the defense in § 547(c)(1). On the other hand, if the collateral increases in value after payment, an undersecured party might be relieved of liability by the timing rule in question.

*Id.* The City did not present a new value defense.

**14.** Section 60(a)(a) read:

(1) A preference is a transfer, as defined in this Act, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and within four months before the filing by or against him of the petition initiating a proceeding under this Act, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class.

Vol. A, *Collier on Bankruptcy*, App. Pt. 3(a) (Matthew Bender 2017).

The relevant legislative history states:

The phrasing of the final element changes the application of the greater percentage test from that employed under current law. Under this language, the court must focus on the relative distribution between classes as well as the amount that will be received by the members of the class of which the preferee is a member. The language also requires the court to focus on the allowability of the claim for which the preference was made. If the claim would have been entirely disallowed, for example, then the test of paragraph (5) will be met, because

547(b)(5) appears to compel the same conclusion. Indeed, at least one treatise states that section 547(b)(5) codifies the Supreme Court's holding in *Palmer Clay* regarding the timing of valuation. *Collier on Bankruptcy*, ¶ 547.03[7].

Though some courts disagree with this conclusion when the transfer involves a secured debt, *see, e.g.*, *In re Alabama Aircraft Indus., Inc.*, 11–10452 (PJW), 2013 WL 6332688, at *3 (Bankr. D. Del. Dec. 5, 2013) (distinguishing *Palmer* as only applying when creditor is unsecured and holding that the dates of transfer of installment payments is the time to value the property when the creditor is secured), the parties here do not appear to argue about whether to value the Property on the transfer date as opposed to the petition date. Rather, they disagree on whether to consider the City's lien as of the transfer date as opposed to the petition date. And GGI's argument that the Property depreciated in value after the City took ownership certainly could not apply to the period from the transfer until GGI negotiated its postpetition $690,000 contract price up from its prepetition $530,000 contract price. Thus the value on the transfer date and the petition date are likely not to differ significantly enough to change the result in this case.

In deciding whether a trustee would sell the property in a hypothetical chapter 7 case, the court in *Rambo* considered not just the sale price the trustee might obtain, but subtracted out the costs of sale, including realtor commissions, taxes, and the trustee's commission. *Id.*, at 434. In addition, the court subtracted out the debtor's exemption, any prior liens, and professional fees that included attorney's fees for bringing a section 363(h) motion (because

the property at issue was co-owned by a non-debtor spouse) and fees for an accountant to determine the taxes owed on the sale. *Id.*, at 434–35. Because these expenses swallowed up the value of the property such that there would be no distribution to creditors, and therefore the trustee would abandon it rather than administer it, the *Rambo* court concluded that the creditor received more by the transfer than it would have in a chapter 7 case, despite its security interest. *Id.*, at 435.

■ But as all of this turns on the value of the Property, this court will deny summary judgment in favor of the City on the Second Count as there is a genuine issue of material fact precluding judgment.

## C. Count Three—Section 550(a)

Section 550(a) provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a) (2017). As it is the only transferee, there is no dispute that the City is the initial transferee.

In its Complaint, GGI seeks restoration of the Property to it as an asset of its bankruptcy estate. But in its opposition to summary judgment, it states that though it

---

the creditor would have received nothing under the distributive provisions of the bankruptcy code.

Vol. C, *Collier on Bankruptcy*, HR Rep No. 595, 95th Cong, 1st Sess 372 (1977).

would prefer to receive the Property, it is also amenable to recovering the value of the Property as of the December 31, 2015 transfer.

The City argues that the Property is not subject to recovery pursuant to section 550(a) because there is no value for the benefit of creditors of the estate since its secured claim plus Kenneth Rock's exceed $700,000, thus there is no equity for unsecured creditors or a bankruptcy estate. But this argument was made prior to Mr. Rock agreeing to subordinate his claim and thus only share in any distribution after payment in full to unsecured creditors.

 While the fraudulent transfer laws are intended to protect the debtor's creditors, *EBC I v. America Online, Inc. (In re EBC I, Inc.)*, 382 Fed.Appx. 135, 137 (3d Cir. 2010); *In re R.M.L., Inc.*, 92 F.3d at 150, section 550(a) instead speaks in terms of "benefit to the estate." *In re New Life Adult Med. Day Care Ctr., Inc.*, 11–43510 (NLW), 2014 WL 6851258, at *6 (Bankr. D.N.J. Dec. 3, 2014); *TWA v. Travellers Int'l AG. (In re Trans World Airlines, Inc.)*, 163 B.R. 964, 972 (Bankr. D. Del. 1994). If there is no reorganized entity or creditors to receive post-confirmation payment, there may be no benefit to the estate, just benefit to the owners of the debtor. *In re New Life Adult Med. Day Care Ctr., Inc.*, 2014 WL 6851258, at *6. *See TWA*, 163 B.R. at 972 ("the Code clearly contemplates the use of avoidance action recoveries in the operation of the business in a manner which only indirectly benefits creditors.").

 It is within a court's discretion to determine whether the court should order payment of the value of the property or the property. *Berley*, 492 B.R. at 442. Some courts believe that section 550(a) gives a preference to the return of property unless it would be inequitable to do so.

*Id.* (citing *In re Classic Drywall, Inc.*, 127 B.R. 874, 876 (D. Kan. 1991)). "This approach finds some support in the language of § 550(a) and the history behind it. Section 60(b) of the Bankruptcy Act allowed the recovery of value only when the property had been converted. While this limitation is gone, § 550(a) lists first the recovery of property and then permits the recovery of value only upon the order of the court." *Id.* at 442–43. "Other courts have simply read § 550(a) as placing in the court's discretion the choice between return of the property and an award of its value." *Id.* at 443.

This court appreciates the comments of the *Berley* court, also examining a tax sale foreclosure on summary judgment, on the issue:

> Without a complete record before the Court, it cannot be determined whether the relief of recovering the value of the lien would more appropriately restore the bankruptcy estate to the financial condition it would have enjoyed if the transfer had not occurred. Although the court has not had an evidentiary hearing to determine the value of the Property, a monetary remedy would facilitate "the prime bankruptcy policy of equality of distribution among creditors." Moreover, providing monetary relief would prevent the clouding of title by precluding transfer of the Property back to the Debtor. Without a proper valuation, however, this Court cannot determine on this record whether the value of the Property would more appropriately restore the Debtor to the financial condition it would have enjoyed if the transfer had not occurred; rather, the Court is merely stating that a monetary remedy may be warranted under the facts and circumstances of this case.

*Id.*

Factors considered by courts in making this discretionary decision of whether to

order recovery of the property or its value include whether the property is recoverable, whether the property has diminished in value by virtue of depreciation or conversion, whether there is conflicting evidence as to the value of the property and whether the value of the property is readily determinable and a monetary award would result in a savings to the estate.

*Collier on Bankruptcy,* ¶ 550.02[3] (Matthew Bender 2017) (footnote omitted).

■■■ GGI alleges that the Property has depreciated in value. If so, a monetary recovery might more effectively return it to the position in which it was prior to the transfer. *See Official Committee of Asbestos Claimants of G–I Holdings, Inc. v. Building Materials Corp. (In re G–I Holdings, Inc.),* 338 B.R. 232, 251 (Bankr. D.N.J. 2006), *vacated and remanded on other grounds,* CIV. 04–3423, 2006 WL 1751793 (D.N.J. June 21, 2006); *Hirsch v. Gersten (In re Centennial Textiles, Inc.),* 220 B.R. 165, 177 (Bankr. S.D.N.Y. 1998); Collier on Bankruptcy, ¶ 550.02[3] (Matthew Bender 2017). *See also ASARCO LLC v. Americas Mining Corp.,* 404 B.R. 150, 181 (S.D. Tex. 2009) (ordering return of stock where that was the remedy most likely to put the estate back in the position in which it would have been prior to the transaction).

However, this court is also reluctant to order a municipality to come up with cash. Absent good cause, possibly including the City's consent to this alternative, the better exercise of discretion may be to order return of the Property. But if intending to propose a liquidating plan, the court must be assured that GGI can make a prompt cure of postpetition taxes, immediately insure the Property, and provide ongoing adequate protection to the City while the disclosure statement and plan confirmation process progresses. Indeed, given the history of GGI being unable to consummate a sale in its previous case, the court would be interested in understanding the feasibility of a sale in this case when trying to fashion an appropriate remedy. Else GGI may ultimately face dismissal, with reinstatement of the avoided transfer.

But as fashioning an appropriate remedy turns on whether GGI prevails in avoiding the transfer, which cannot be determined from the facts presently before it, this court will deny summary judgment on the Third Count as there is a genuine issue of material fact precluding judgment.

## V. CONCLUSION

Based on the foregoing, the City's Motion for Summary Judgment is denied.

An appropriate judgment has been entered consistent with this decision and trial will be set after conferring with the parties.

The court reserves the right to revise its findings of fact and conclusions of law.